514 F.Supp. 890 (1981)
ROESCH, INC., et al., Plaintiffs,
v.
STAR COOLER CORPORATION, Tour Ice Midwest, Inc., and Hussmann Refrigeration, Inc., Defendants.
No. 80-1081 C (1).
United States District Court, E. D. Missouri, E. D.
May 1, 1981.
*891 Larry B. Luber, William J. Travis, Greensfelder, Hemker, Wiese, Gale & Chappelow, St. Louis, Mo., for plaintiffs.
Barry A. Short, St. Louis, Mo., Byron Roche, Burton Halpern, Bridgeton, Mo., for defendants.

MEMORANDUM
WANGELIN, Chief Judge.
This suit was brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, by plaintiffs Roesch, Inc., and its wholly owned subsidiary Marketing Division, Inc., against defendants Star Cooler Corporation, Tour Ice Midwest, Inc., and Hussmann Refrigeration.[1] The gravamen of plaintiffs' complaint was that it was terminated as a "private label" customer of Star Cooler pursuant to a conspiracy between two or more of the defendants to fix or maintain the resale prices of ice merchandisers in the United States.
Trial of the matter was commenced on April 14, 1981, and continued through April 21, 1981. At the close of plaintiffs' case on liability, all defendants moved the Court for directed verdicts. The Court heard arguments on these motions and, after consideration of the evidence adduced by plaintiffs at trial and the legal briefs and memoranda filed by the parties prior to trial, concluded that verdicts for the defendants should be directed pursuant to Rule 50, Fed.R.Civ.P. After viewing the evidence, together with all reasonable inferences to be drawn therefrom, in the light most favorable to plaintiffs, the Court finds that no reasonable person could find in favor of plaintiffs in this lawsuit and thus directed verdicts should be ordered. Dobson v. Bacon Transport Co., 607 F.2d 805, 806-807 (8th Cir. 1979); Lisa-Jet, Inc. v. Duncan Aviation, Inc., 569 F.2d 1044, 1046 (8th Cir. 1978); Decker-Ruhl Ford Sales, Inc. v. Ford Motor Credit Co., 523 F.2d 833, 836-837 (8th Cir. 1975).

FACTUAL BACKGROUND
This case principally concerns the sale and marketing of a refrigerated bin designed to hold packaged ice, known as an "ice merchandiser." Roesch entered into a verbal agreement with Star Cooler during the first week of March, 1980, to purchase "private label" ice merchandisers from Star Cooler (together with other products). The testimony concerning this verbal agreement shows that the products sold to Roesch were to have various changes in appearance to make them resemble the type of ice merchandisers sold by Roesch.[2] Counsel for plaintiffs made the judicial admission to the Court that this verbal agreement dealt exclusively with "private label" merchandise.
After this verbal agreement was reached, plaintiffs immediately thereupon commenced selling Star-built ice merchandisers as "Star Maid" ice merchandisers through direct telephone solicitations over the telephone. This slogan, "Star Maid," (which is indistinguishable from the statement that the products were "Star-made" when used over the telephone) was not discussed with Star Cooler before it was used.
After about eleven days of selling these products, during the first week of April, 1980, plaintiffs were advised by a representative of Star Cooler that the verbal agreement between the parties was terminated. In a subsequent letter to Roesch's counsel dated July 24, 1980, the General Manager of Star Cooler stated the reason for this decision as follows:
"Star Cooler Corporation has never orally or in writing authorized Roesch, *892 Inc., as a distributor of its products. Star manufactured equipment for Roesch pursuant to Star's understanding that Roesch desired to purchase certain items in Star's product lines to be marketed under the Roesch trade name and represented to customers of Roesch as Roesch products. Contrary to such representations made by Roesch to Star, Roesch represented this equipment as being Star manufactured and as Star equipment. When this conduct persisted, Star declined to further "private label" such equipment for Roesch. Star has completed and delivered all items of equipment ordered by Roesch, Inc., from Star." (Plaintiffs' Exh. 21)
Plaintiffs proposed to prove that this decision to terminate the verbal "private label" agreement with Roesch was pursuant to a conspiracy between Star Cooler and others of its distributors to fix the resale price of ice merchandisers and that the Roesch agreement was cancelled because Roesch offered Star Cooler equipment at prices below the prevailing market prices for ice merchandisers.
The evidence showed that Star Cooler offered Roesch, Inc., a discount of about 65 percent off list price on the ice merchandisers sold under the verbal private label agreement.[3] This is the lowest discount offered to any customer by Star Cooler; the only other purchasers entitled to this discount are distributors of Star-labeled ice merchandisers who make volume purchases of the product, maintain inventories, and employ service personnel to install the units and to honor warranty claims. Roesch was not obligated to fulfill any of these conditions in order to obtain the 65 percent discount. Roesch made only such purchases of Star equipment as it had already sold through telephone solicitations.
Plaintiffs contended that Star Cooler and its distributors agreed to fix the resale price of Star ice merchandisers at a certain level (called "D-15" or "List less 50 percent less 15 percent). There was evidence that Star Cooler in September 1979 suggested to some of its "stocking distributors" that they offer ice merchandisers for sale at "D-15" price levels, but there was no evidence that this suggestion was followed or that Star Cooler ever applied any pressure or coercion on any distributor to adhere to this price. For example, no suggestion concerning its resale prices was made to Tour Ice Midwest at any time nor did Tour Ice discuss the prices it was charging for Star ice merchandisers with anyone at Star Cooler. Plaintiffs presented no evidence concerning (1) the volume of sales of ice merchandisers in the United States, (2) the share of this market enjoyed by Star Cooler, (3) the number of distributors competing in the ice merchandiser industry, (4) the nature and extent of price competition in this industry, or (5) the volume of sales made by Star Cooler or any other party at "D-15" levels.
The evidence at trial was that at no time prior to the termination of the parties' verbal agreement did Star Cooler make any suggestion to Roesch concerning the resale prices Roesch should charge for ice merchandisers manufactured by Star or impose any restriction of any type on Roesch's ability to sell Star manufactured equipment, except that Star contends that Roesch agreed to sell the equipment on a private label basis rather than as a Star product.
Finally, the evidence at trial, in the words of Roesch's President and principal shareholder, Robert Voges, showed that plaintiffs' growth in the ice merchandiser market "has been substantial" (Tr. 8) and "I'm pretty well pleased with the market penetration we have made" (Tr. 12). In 1980, Roesch sold $950,000 in ice merchandisers.

LEGAL CONCLUSIONS AND FINDINGS
The Roesch verbal private label "agreement"to the extent such an agreement existedwas plainly terminable at will by either party. Lockewill, Inc. v. United States Shoe Corp., 547 F.2d 1024, 1029 (8th *893 Cir. 1976), cert. denied, 431 U.S. 956, 97 S.Ct. 2678, 53 L.Ed.2d 272 (1977) (construing Missouri law). Plaintiffs have so acknowledged and have not proceeded on a claim that Star Cooler breached the agreement.
In order to prove that defendants violated Section 1 of the Sherman Act, plaintiffs had to prove:
(1) That there was a conspiracy between two or more of the defendants or between a defendant and some other party, that resulted in the termination of the private label agreement between Roesch and Star Cooler;
(2) That the conspiracy referred to in Paragraph (1) had the intent or effect of unreasonably restraining trade in ice merchandisers in the United States.
Plaintiffs failed to prove either of these two elements of a Section 1 violation.

A
There was no evidence of any conspiracy between Star Cooler and any other person or entity to terminate the verbal private label agreement with Roesch. Plaintiffs' sole evidence relating to the alleged conspiracy involved the deposition testimony of D.H. Smith of Star Cooler and Donald Carpenter of Tour Ice Midwest, who described two telephone conversations in which they participated. These two conversations were between distributors of Star Cooler and employees of Star, during which the sales and pricing practices of Roesch were described by the distributors.[4] During their depositions, Messrs. Smith and Carpenter testified that no agreement was reached during these telephone calls that Star Cooler would terminate its agreement with Roesch; they also testified that the distributors did not request, nor did Star Cooler's employees volunteer, any such action.
Plaintiffs claim that from these facts, the jury could infer that there was an antitrust conspiracy between these parties to terminate the Roesch agreement. They ignore the settled principle that:
"Mere complaints by customers of a manufacturer that distributors and dealers engage in price-cutting and selective discounting are not enough to imply a combination in violation of § 1, for such complaints arise in the normal course of business."
Interphoto Corporation v. Minolta Corporation, 295 F.Supp. 711, 719 n. 3 (S.D.N.Y. 1969), affirmed, 417 F.2d 621 (2d Cir. 1969) (Per Curiam); Carbon Steel Products Corp. v. Alan Wood Steel Co., 289 F.Supp. 584 (S.D.N.Y.1968); Carr Electronics Corp. v. Sony Corporation of America, 472 F.Supp. 9, 13 (N.D.Cal.1979) As the Second Circuit held in Borger v. Yamaha Intern. Corp., 625 F.2d 390, 395 (2d Cir. 1980), "it was not improper for [the defendant] to consult with its dealers and ... those consultations, standing alone, would not establish the existence of a combination or agreement under the Sherman Act." In Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir. 1980), cert. denied, ___ U.S. ___, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) (1011 ATRR A-1), the Court recently upheld a grant of a directed verdict on facts quite similar to those in this case, holding:
"The necessary first step toward appellants' proof of a prohibited § 1 conspiracy was proof of a causal relationship between competitor complaints that Sweeney was selling Texaco gasoline several cents below their own price, and the reduction of Sweeney's hauling allowance .... The mere reception of complaints by Texaco would be insufficient to prove this causal nexus. Nor would it suffice to prove only that some Texaco employees who knew of the complaints were also the ones who decided to terminate Sweeney's distributor agreement and change its hauling allowance. The evidence must permit the inference that the alleged conspirators `had a unity of purpose or a *894 common design and understanding, or a meeting of the minds.'" (Emphasis supplied) (Citations omitted)
As in the Sweeney case, no such "causal nexus" was proven, and in the absence of evidence that Star Cooler decided to terminate Roesch because of competitor complaints and evidence of such a conspiracy, "it would have been improper for the court to allow the jury to speculate on the cause for [the defendant's] action." Id. at 115.
The telephone conversations between Star Cooler and the two distributors did not evidence a conspiracy. In the case of Tour Ice Midwest, the only testimony concerning this call appeared in the deposition testimony of Donald Carpenter, who explained that he called merely to inform Star Cooler that Roesch was holding itself out as a Star distributor with the intent to demand that Tour Ice be given the same discount that Roesch was enjoying. Such complaints designed to demand equal treatment on the part of a manufacturer are lawful and, indeed, promote the goals of the Robinson-Patman Act. Westinghouse Electric Corp. v. CX Processing Laboratories, Inc., 523 F.2d 668, 676 (9th Cir. 1975); Baer v. Esprit de Corp., 1980-81 CCH Trade Cases ¶ 63,614 at 77,262 (N.D.Calif.1980).
With respect to Hussmann Refrigeration, Inc., plaintiffs failed to offer any evidence from which the jury could have inferred the existence of an agreement or combination with Star Cooler to terminate the agreement with Roesch. Additionally, plaintiffs failed to sustain their burden of proving that Hussmann and Star were legally capable of conspiring together inasmuch as the two companies were both wholly owned by Hussmann Refrigerator Company and acted as part of the same economic entity. See Ogilvie v. Fotomat Corporation, 641 F.2d 581 (8th Cir., 1981).
Plaintiffs have referred the Court to one case that is arguably relevant to their theory concerning the inference of a conspiracy in these circumstances, Girardi v. Gates Rubber Company Sales Division, Inc., 325 F.2d 196 (9th Cir. 1963). This case has been often distinguished and is of questionable authority,[5] and in any event is easily distinguished from the present case. In Girardi, plaintiffs proved that defendant Gates Rubber established a suggested resale price for its products that was adhered to by its two distributors in the Stockton, California area; that when one of these two distributors threatened to offer prices below these suggested retail prices at two of its three resale outlets, it was threatened with termination if it did so; that Gates received complaints from its other distributor concerning Girardi's discounting activities, and that internal memoranda of the defendant showed that Girardi's competitors "are putting a lot of pressure on us to make this impossible for him." See 325 F.2d at 200-03. Indeed, the evidence further showed that prior to establishment of plaintiff as a distributor of Gate's products, there were complaints from other distributorsand Gate's persuaded them that they "would be better off with [plaintiff] handling Gates belts where we could exercise some control over his marketing practices than he would be were [plaintiff] compelled to take on one of the gyp lines and follow through with a price eroding marketing policy." Id. at 202.
There was no similar evidence here. Robert Voges and his daughter Debra, who managed Roesch's direct sales operations of ice merchandisers, admitted that Star Cooler made no suggestions to them prior to termination concerning their resale prices. There was no threat of termination, in an attempt to induce adherence to suggested resale prices. Nor was there any internal documents or any other evidence that Star Cooler acted in response to any pressure *895 from other distributors. In these circumstances, it would be impermissible speculation for the jury to draw any inference as to the existence of an antitrust conspiracy.

B
Even if it were assumed, arguendo, that plaintiffs made a sufficient factual showing on the existence of a conspiracy to justify sending the case to the jury, they failed to prove that this conspiracy had the effect or was entered into with the intent of unreasonably restraining trade. Accordingly, the plaintiffs failed to meet their burden of proof with respect to the second element of a Section 1 case.
Plaintiffs relied solely on the claim that the alleged conspiracy to terminate Roesch's agreement was part of a broader conspiracy to fix the resale prices of Star ice merchandisers in the United States. They point to the fact that in September 1979, Star Cooler issued a memorandum to stocking distributors suggesting that resale prices of ice merchandisers should not be discounted below "D-15" and they point to the fact that during a telephone conversation between David Smith (of Star Cooler) and Robert Voges (of Roesch), which Mr. Voges secretly recorded,[6] Mr. Smith made several references to the fact that Roesch's prices on ice merchandisers were below the market and were undercutting other distributors. From these facts, plaintiffs argue that the jury could infer the existence of a price-fixing conspiracy.
Plaintiffs presented no evidence, of any type, that any distributor of Star Cooler products adhered to any fixed or agreed upon resale price. Indeed, Debra Voges (who managed the direct telephone sales solicitations staff at Roesch), stated that she would not be surprised if Tour Ice sold ice merchandisers below "D-15" nine times out of ten. There is no evidence that Star Cooler ever threatened any distributor with termination if it did not adhere to any fixed price or that Star Cooler imposed any restrictions of any type on its distributors. The Roesch employees acknowledged that Star Cooler imposed no restraints on their ability to sell Star-manufactured products.
In these circumstances, there can be no inference that the defendants were engaged in price fixing. The issuance of recommendations concerning resale prices is, of course, wholly proper. Chisholm Bros. Farm Equipment Co. v. International Harvester Co., 498 F.2d 1137, 1142-43 (9th Cir.), cert. denied, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); Klein v. American Luggage Works, Inc., 323 F.2d 787 (3d Cir. 1963). There was no evidence of any coercion on the part of Star Cooler to require adherence to the suggested resale price. The issuance of this recommendation cannot give rise to any inference of unlawful conduct or intent.
But plaintiffs can draw no comfort from the telephone conversation, either, assuming that the conversation is faithfully reproduced in the recording.[7] It is clear that Star Cooler had the right to select its own distributors and to do business with whomever it chose. Oreck Corp. v. Whirlpool Corp., 579 F.2d 126, 133 (2d Cir.) (en banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); see also, Burdett *896 Sound Inc. v. Altec Corporation, 515 F.2d 1245, 1249 (5th Cir. 1975). Under the Colgate Doctrine, Star Cooler had the further right to terminate a distributor on a unilateral basis if it was dissatisfied with the distributor's pricing practices. See United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). But this is not a Colgate case, because Star never made any suggestions to Roesch about the prices it should charge or how it should competeexcept that Roesch was to sell only private label products.
The recording of the telephone conversation, taken in the light most favorable to the plaintiffs, shows only that Star Cooler had a concern that plaintiffs unauthorized efforts to sell Star-labeled products in direct competition with Star distributors who labored under materially higher operating costs imposed as a condition to qualify as a "stocking distributor", would give plaintiffs an unfair competitive advantage in the marketplace. There is no suggestion in the conversation that Star Cooler was acting pursuant to any conspiracy or that it had sought to require that Roesch maintain a fixed price for Star-built ice merchandisers. In the circumstances it is apparent that if Roesch were to have been permitted to continue its efforts to sell Star-built ice merchandisers as if they were Star-labeled units, but purchased the equipment at the substantially reduced price offered by Star to private label customers, it could undercut its competition with impunity. The recording shows Star Cooler's entirely proper concern with this situation. This conversation does not give rise to a permissible inference that Star Cooler and the other defendants were engaged in price-fixing and does not justify sending the case to the jury.
For all these reasons, the Court finds that plaintiffs have failed to sustain their burden of proof under Section 1 of the Sherman Act, and that verdicts should and hereby are directed to be entered in favor of defendants.
NOTES
[1] Counts II, III and IV of plaintiffs' Amended Complaint were dismissed by stipulation of the parties prior to trial. These other counts alleged violations of Section 2 of the Sherman Act and of the Missouri and Illinois antitrust statutes.
[2] At the time of this verbal agreement, Roesch sold three other lines of ice merchandisers: (1) a line it manufactured for resale; (2) a line of "private label" ice merchandisers it purchased from Leer Manufacturing Co.; and (3) a line of Leer ice merchandisers, sold under the Leer tradename. The Leer agreement further provided that it was terminable at will by either party with 30 days notice.
[3] This discount is stated as "List Price less 50 percent less 15 percent less 14 percent less 4 percent."
[4] These two distributors, Tour Ice Midwest and Hussmann Refrigeration, Inc., are co-defendants in this action.
[5] Chisholm Bros. Farm Equipment Co. v. International Harvester Co., 498 F.2d 1137, 1141 (9th Cir.), cert. denied, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); A.G. Rogers Co. v. Merck and Co., Inc., 498 F.Supp. 5, 7-8 (E.D. Tenn. 1980); Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 478 F.Supp. 243, 256 (E.D.Pa. 1979), affirmed, 637 F.2d 105 (3d. Cir. 1980); Carr Electronics Corp. v. Sony Corp. of America, supra, 472 F.Supp. 9, 13 (N.D.Cal.1979); Belk-Avery, Inc. v. Henry I. Siegel Co., Inc., 457 F.Supp. 1330, 1335 (M.D.Ala.1978); Plastic Packaging Materials, Inc. v. Dow Chemical Co., 327 F.Supp. 213, 227 (E.D.Pa.1971).
[6] Mr. Voges testified that he made it a practice secretly to record telephone conversations when made to persons outside the state of Illinois because, he explained, he had been advised that it was a felony in the State of Illinois to make such secret recordings. Indeed, Ill. Rev.Stat. Ch. 38, § 14-6 so provides.
[7] As Mr. Voges admitted during his testimony at trial, there are several sounds on the tape that might reflect that the tape has been altered after it was recorded. Mr. Voges changed his testimony concerning the location of the tape recorder during the telephone call between the time he was deposed and the time he testified at trial because, he said, he learned at the deposition of defendants' expert on sound recordings that there were noises on the tape that indicated that it had been altered. Accordingly, Mr. Voges testified at trial that he might have "fiddled" with the tape recorder during the conversation and thus produced the sounds identified by defendants' expert. Naturally, for purposes of considering the motion for direct verdicts, the Court has given the plaintiffs the benefit of all favorable inferences from the record and has assumed that the tape recording is authentic.