**BOSTICK OIL COMPANY, INC., Appellant,**

v.

**MICHELIN TIRE CORPORATION, COMMERCIAL DIVISION, Appellee.**

No. 81–1985.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1982.

Decided March 14, 1983.

Rehearing and Rehearing En Banc Denied May 23, 1983.

Robert E. Staton, Columbia, S.C. (Michael H. Quinn, Quinn, Brown, Staton & Boyle, Columbia, S.C., on brief), for appellant.

O. Doyle Martin, Greenville, S.C. (Natalma M. McKnew, Leatherwood, Walker, Todd & Mann, Greenville, S.C., James M. Micali, Asst. Gen. Counsel, Greenville, S.C., on brief), for appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

■ Bostick Oil Company, Inc., (Bostick) brought this private antitrust suit under various federal and state statutes when the Michelin Tire Corporation, Commercial Division, (Michelin) terminated Bostick's contract as a distributor of Michelin truck tires. At the close of Bostick's evidence at trial, the district court granted Michelin's motion for a directed verdict on the causes of action then remaining:[1] attempt to monopolize under § 2 of the Sherman Act, 15 U.S.C. § 2; contract, combination or conspiracy in restraint of trade, in violation of § 1 of the Sherman Act; and, unfair or deceptive trade practices violating the South Carolina Unfair Trade Practices Act, § 39–5–20(a), Code of Laws of South Carolina 1976. Bostick appeals only from the judgment entered against it on its state law claim and on its two theories of the § 1 Sherman Act violations,[2] asserting that sufficient evidence was introduced to warrant

---

1. By consent of the parties, a claim for breach of contract and a counterclaim for abuse of process had been dismissed with prejudice prior to trial.

2. Michelin maintains that only one theory of § 1 liability, regarding Bostick's termination as a result of pressure on Michelin from complaints by competing distributors, was presented in the pleadings and at trial, so that Bostick should now be foreclosed from arguing that the evidence also supports finding Michelin liable for a resale price maintenance arrangement. Although there may have been some imprecision below as to whether Bostick presented two separate theories or merely two types of evidence in support of a single theory, it is apparent from the district court's memorandum opinion that the resale price maintenance theory was argued by Bostick as a distinct basis for liability. Where the evidence "as developed provides a basis for recovery not covered strictly by the pleadings", the pleadings are treated as conforming to the evidence. *Keeffe Bros. v. Teamsters Local Union No. 592,* 562 F.2d 298, 306 and n. 11 (4 Cir.1977); Rule 15(b), Fed.R.Civ.P. To dispel any doubt, Bostick formally moved to amend the pleadings at oral argument, as it is allowed to do. *See generally* 6 Wright & Miller, *Federal Practice and Procedure:* Civil § 1494. We therefore consider both § 1 theories.

submission of these issues to the jury. We agree, and therefore reverse and remand for a new trial. Because of our disposition of this appeal, we need address only briefly an evidentiary issue also raised by Bostick.

## I.

In reviewing the grant of a motion for directed verdict under Rule 50(a), Fed.R. Civ.P., we view all evidence presented by Bostick, the nonmoving party, in the light most favorable to it, drawing all reasonable inferences in Bostick's favor, *Ard v. Seaboard Coast Line Railroad Company*, 487 F.2d 456, 457 (4 Cir.1973), without weighing the credibility of witnesses. *Old Dominion Stevedoring Corp. v. Polskie Linie Oceaniczne*, 386 F.2d 193, 197 (4 Cir.1967).

Bostick was at one time a small, family-owned oil concern based in Estill, South Carolina, which began shifting its focus to tire sales in 1967. By 1974, Bostick was offering for sale a wide range of passenger car tires and some truck tires. In April 1974, Bostick contacted Michelin, seeking to become an authorized distributor. Michelin, the marketing division of the Michelin Tire Corporation, was then expanding distribution of its radial tires and related products through numerous distributorship arrangements.[3] Responding to the inquiry, Michelin sent its district truck tire sales manager to Estill to survey Bostick's operation and prepare a dealership application. The Michelin representative noted, among other items, the type of tire service available from Bostick. Bostick's application was approved, and it entered the first of four successive one-year standard form Dealer Sales Agreement (DSA) contracts with Michelin on May 29, 1974, authorizing it to sell both passenger and truck tires.

Beginning sometime in 1975 with the employment of an experienced truck tire saleswoman, Bostick shifted the vast majority of its Michelin business into truck tire sales. During its first calendar year as a Michelin dealer, Bostick sold approximately $38,000 in truck tires and $39,000 in passenger tires of that brand.[4] For the calendar year 1976, Bostick's gross sales of truck and light truck tires had soared to slightly over $1,100,000 as compared to $936,827 in passenger tire sales, according to a memorandum written by Michelin's corporate sales manager for the Eastern United States. By the end of April 1978, its last fiscal year as a Michelin dealer, Bostick had sold approximately $2,000,000 worth of Michelin truck tires during the preceding twelve months. The initial impetus for this shift to truck tire sales, according to company president Joe Bostick, came from Michelin's local sales representative during 1974 and 1975, as well as the enticing quantity discounts and commissions built into Michelin's pricing structure.

In expanding its business, Bostick employed the practice of "drop-shipping", *i.e.,* transferring the tires to the purchaser by taking an order and having tires shipped directly, without providing any initial mounting or other service. Although one provision of the Dealer Sales Agreement required Bostick to maintain facilities sufficient to "enabl[e the] Dealer to sell and service Michelin Products in a first class manner", Bostick introduced the testimony of several major truck fleet-owning customers to explain that such purchasers usually maintained their own service facilities. Joe Bostick also testified that his company maintained a service arrangement with a mechanic in Estill, and had received virtually no complaints about a lack of service from customers during the period it was a Michelin dealer.

---

3. A more detailed chronicle of the French tire manufacturer's expansion into the American market can be found in *Donald B. Rice Tire Company v. Michelin Tire Corporation*, 483 F.Supp. 750, 752–53 (D.Md.1980), *aff'd*, 638 F.2d 15 (4 Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981).

4. These figures actually represent Bostick's purchases of Michelin tires through the end of 1974, but they are indicative of its sales. By its method of operation, Bostick bought from Michelin those tires for which it had orders, rather than carrying a large stock. Company president Joe Bostick estimated each figure in the $40,000 range when testifying from memory.

Bostick's primary method of expanding sales was through its aggressive price cutting and rebating of commissions and quantity discounts to its customers. Until the summer of 1977, Michelin offered dealers truck tires at a basic price of 22 percent off of the manufacturer's suggested list price. From this "net billing price," Bostick or any dealer was able to subtract up to an additional 9 percent for a quantity purchase, another 2 percent discount for early payment to Michelin, and a further 2 percent discount if certain shipping arrangements were made.[5] Thus, Bostick was able to give as much as a 6 percent discount to the purchaser off of the "net billing price" and still sell at a gross profit; in effect, Bostick could buy a tire listed by the manufacturer as worth $100 for approximately $68, offering it for as low as approximately $73.30, while a dealer taking no advantage of discounts would have to sell the tire for $83.30 for a comparable total return on each unit sold.[6]

Bostick's sales practices provoked complaints by various competing Michelin dealers to field and district level personnel of the tire company. One general manager of a Charleston, South Carolina, Michelin dealer during the period 1974 to 1978 testified that he had complained to Michelin of Bostick's "coming into the Charleston area and selling truck tires at prices much below what we were selling them for." Three other South Carolina Michelin dealers testified to having complained to Michelin personnel about Bostick's low prices forcing them to decrease their profit margins to compete; one stated that he preferred buying from Bostick as a wholesale supplier because in small quantities it proved cheaper and more convenient than buying directly from Michelin. Several of these dealers on cross-examination gave some support to Michelin's contention that Bostick's lack of service facilities resulted in their having to provide service to Michelin tire owners who had bought the product elsewhere. But one of the dealers explained that the cost of the tire did not reflect the cost of future service, for which the customer was charged separately as provided, and that service had become for that dealer "a big key to our growth" representing approximately 50 percent of his total business volume.

Internal Michelin memoranda, and testimony of Michelin personnel at various levels, showed that numerous such complaints were passed along to middle and upper-level management, as well as being originated by Michelin field and sales representatives themselves. As early as August 1975, a field representative's monthly report to management quoted Bostick's discount pricing and noted that another dealer "will not meet this price." By the spring of 1976, complaints about Bostick had reached Jean Pierre Duleyrie, Michelin's vice-president in charge of sales, prompting him to send a corporate sales manager (the Michelin official immediately below Duleyrie) to talk directly with Joe Bostick in April 1976. Though the actual motivation behind the meeting and its contents were much in dispute at trial, the outcome was a renewal of Bostick's dealership for 1976–77 and possibly a promise by Bostick to expand service facilities. The complaints by competitors and Michelin sales personnel nonetheless persisted during the remainder of Bostick's distributorship.

Shortly before the May 29 renewal date of Bostick's dealership contract in 1977, Michelin's district manager approached Joe

---

**5.** There was also the potential for a 5 percent calendar year bonus if sales reached a certain volume. During the period until mid-1977, Bostick apparently never reached the requisite volume; its allegation that a quantity bonus was earned but unpaid was in part the subject of one of the claims not at issue in this appeal.

**6.** Of course, for a comparable percentage markup based on the cost of the tire (*i.e.,* approximately 7.8 percent), the other dealer would have charged roughly $84.00. In addition, the discount price available to Bostick may have been better still; the evidence was unclear whether the additional discounts were taken from the assumed $78 net billing price, from the $100 list price, or from the net price to Bostick after each prior discount was figured. The figures used here as examples reflect the most conservative manner of calculating the discount.

Bostick to explain the company's proposal to enroll Bostick in a "National Accounts" program. Various large-volume purchasers designated "national accounts" were billed and their accounts collected centrally through Michelin, while distributors such as Bostick continued to perform the actual selling and delivery of tires for which they were paid a commission. Participation in the program required disclosure of customer lists to Michelin, and loss of the ability in the first instance to quote a price for the tires. Continuation as a Michelin dealer was not made expressly conditional on joining the National Accounts program; by the stated terms, a dealer could continue to sell to some accounts as before and list others as National Accounts in any desired mix.

Michelin explained, through cross-examination, that the National Accounts pricing structure proved capable of giving a dealer an advantage over the regular distribution terms. A National Accounts customer was billed by Michelin at a 20 percent discount off the list price; the dealer who delivered the tire from his stock was credited by Michelin at 22 percent off suggested list price and was paid a 12 percent commission on each National Accounts tire sold.[7] Thus the dealer could rebate a substantial part of the commission to the National Accounts customer and in effect reduce the price of the tire below that of a direct sale from the dealer. Bostick, as an aggressive seller, eventually gave from half to all of the commission back to its National Accounts customers in the form of rebates. Michelin officially did not disclose the price it charged the customer, although the suggested price list apparently was easily obtainable from customers.

Despite the eventual attractiveness of National Accounts sales to Bostick, Joe Bostick testified that he personally had felt "intimidated" into joining the National Accounts program during meetings near dealership renewal time in 1977.[8] In support of this contention, Bostick introduced the recommendation in the April 1977 monthly report of Michelin district manager Elroy Earl "Pete" Christensen, Jr. to "management" that Bostick not be renewed as a dealer. During April and May, Christensen, despite frequent contact, refused to answer Joe Bostick's inquiries as to whether or not the dealership would be renewed. On May 28, 1977, with Michelin representatives still seeking to enroll Bostick in the National Accounts program, the dealership legally expired. On June 7, 1977, Bostick made its first sale through the National Accounts program, and actual dealership renewal followed on June 14. Contemporaneously, Christensen noted in a semi-annual June 1977 planning report to management that encouragement from Michelin representatives to larger purchasers to participate in the National Accounts program "should help a great deal in the area where dealers are wholesaling and dropping off." A preceding portion of the same memorandum identified Bostick as "the most pressing problem" in the district and expressed optimism over Bostick's recent willingness to enter the National Accounts program.

Michelin's enthusiasm over Bostick's National Accounts participation soon waned. Christensen's July 1977 report expressed concern over Bostick's solicitation of existing customers for National Accounts treatment and noted that Bostick had begun giving rebates as high as 15 percent on purchases program. Internal memoranda were also directed to management com-

---

**7.** In actual practice, much of the financial relationship between dealer and Michelin was accomplished through accounting. for tires "bought" and "sold" on each company's books. The record does not reflect clearly at what point cash actually flowed between the companies, but the practical effect on Bostick's credit with Michelin was as described here.

**8.** Michelin has argued before us that Joe Bostick's testimony was "incredible" given his

business acumen. While that may well be the case, we think, as we explain more fully below, that the issue remains one of many for resolution by the jury. For the most part, moreover, Bostick's subjective feeling of intimidation is of little relevance, as there is sufficient objective evidence from which a jury could conclude that as a matter of fact dealership renewal was being held up until Bostick acquiesced in joining the National Accounts program.

plaining that Bostick was purchasing tires from a Canadian source and selling them through the National Accounts program; the Michelin corporate sales manager informed district manager Christensen that although "we can do nothing legally" about the practice "you will ask him kindly not to do so."

Complaints about Bostick's merchandising tactics continued to be reported to Michelin management throughout 1977–78. Finally, for reasons that are the central subject of this dispute, Michelin representatives notified Bostick in April 1978, that its truck tire dealership would not be renewed in May, although continuation of passenger and light truck tire distributorship was offered. Bostick refused the limited dealership offer and instead brought this suit on May 26, 1978.

## II.

Bostick asserts claims under § 1 of the Sherman Act on essentially two distinct but related theories. The first is that Bostick was eventually terminated as a dealer because Michelin heeded the complaints of Bostick's competitors, who were threatened by Bostick's ability to undersell them. The alternative theory is that the National Accounts program was a resale price maintenance scheme, and to enforce it Michelin terminated Bostick, a dealer who continued effectively to lower the manufacturer-imposed minimum price for its customers. The interrelationship of the two is shown by perhaps a third view, that Michelin's pressing Bostick to join the National Accounts program was a less drastic attempt at satisfying the competing dealers' complaints which failed to curb Bostick's price cutting, ultimately requiring Bostick's termination. For all these claims, of course, Bostick must introduce sufficient evidence upon which a jury would be warranted in finding a "contract, combination,

... or conspiracy" as a prerequisite to § 1 liability. 15 U.S.C. § 1; *compare United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), *with United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). If such is found, it must be one which is unreasonably "in restraint of trade." *Continental T.V., Inc. v. GTE Sylvania Incorporated,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). The district court believed one or the other element was lacking in plaintiff's case for each theory and so granted Michelin a directed verdict. We discuss each theory and the necessary elements seriatim.

### A.

Michelin argues strenuously that mere complaints do not a conspiracy make, and cites to us cases for this proposition. *See, e.g., H.L. Moore Drug Exchange v. Eli Lilly and Company,* 662 F.2d 935 (2 Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Roesch, Inc. v. Star Cooler Corporation,* 514 F.Supp. 890 (E.D. Mo.1981), *aff'd,* 671 F.2d 1168 (8 Cir.1982).[9] Were this a proper case, we might well agree with this unstartling principle. In this case, however, the evidence elicited at trial showed more than just uninfluential competitors' complaints "standing alone", *H.L. Moore Drug, supra,* 662 F.2d at 941.

Antitrust civil conspiracy or combination [10] has traditionally been inferred " 'from a course of dealing or other circumstances' " in which the determinative facts are "what the parties actually did" rather than whether an express agreement existed. *Parke, Davis, supra,* 362 U.S. at 43–44, 80 S.Ct. at 511; *Eastern States Retail Lumber Dealers' Assoc. v. United States,* 234 U.S. 600, 34 S.Ct. 58 L.Ed. 1490 (1914); *Albrecht v. The Herald Co.,* 390 U.S. 145, 149–50, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). As we noted in *Hester v. Martin-*

---

**9.** *Roesch,* however, holds in conflict with *Battle v. Lubrizol Corp.,* 673 F.2d 984 (8 Cir.1982), which was decided the same day. The Eighth Circuit granted rehearing in banc in both cases on May 21, 1982, and heard arguments in October 1982. Decision is currently pending.

**10.** There is no contention that a contract was entered into between Michelin and other dealers regarding Bostick in regard to this first theory.

dale-Hubbell, Inc., 659 F.2d 433, 436 (4 Cir. 1981), cert. denied, 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982), the courts, being " 'sensitive to the realities of the marketplace' . . . have extended the concept of concerted activity far beyond the classic case of actual agreement to engage in a common course of conduct." Contrary to what the district court believed, that Michelin did not expressly inform complaining dealers that it would terminate Bostick at their behest cannot be determinative.

In an analogous case we recently addressed the basis upon which the trier of fact could be permitted to find " 'the requisite degree of involvement of other parties' to infer a conspiracy under United States v. Parke, Davis & Co." Donald B. Rice Tire Company v. Michelin Tire Corporation, 638 F.2d 15, 16 (4 Cir.), cert. denied, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981) (citation omitted). In Rice, we affirmed the district court's finding of a "combination" despite the absence of any formal manufacturer-dealers agreement, or even of evidence that rival dealers had ever been consulted by Michelin following their complaints against Rice, like Bostick a high-volume Michelin dealer eventually terminated. The evidence at that trial showed:

> Jean Pierre Duleyrie, the Vice-President in charge of sales, and the individual primarily responsible for the nonrenewal decision conceded that complaints from Michelin sales personnel in other areas and from other tire dealers about plaintiff's geographically extensive and large-scale wholesaling activities contributed to the decision. While Michelin sales personnel do not qualify as economically distinct entities with whom defendant could conspire or contract, Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025 (2d Cir.1979), other Michelin tire dealers do qualify. Numerous other witnesses testified that other tire dealers complained to Michelin personnel about plaintiff's activities. In light of this testimo-

ny, as well as Duleyrie's concession that no other types of complaints from any sources about any other aspects of plaintiff's business were received prior to the nonrenewal decision, it is apparent that a combination existed for the purposes of § 1 between Michelin and some of its authorized dealers.

Rice v. Michelin Tire, supra, 483 F.Supp. at 754. The evidence adduced in the instant case, as we have summarized it, was quite similar.

As in Rice, the testimony of Mr. Duleyrie, Michelin's sales vice president during the relevant time period, shows personal knowledge of the complaints and discussions between Bostick and Michelin's district manager leading up to the renewal decision in 1976. Speaking generally, Duleyrie admitted hearing of complaints by other dealers about Bostick's underselling them "all the time," although he characterized such complaints as "everyday-type" to which "our people are instructed not to pay attention." He also conceded, "I don't know of any instances where Bostick was asked to perform service and failed to do it." [11]

Mr. Duleyrie's knowledge of the complaints, and his direction of subordinates to take various actions in response, can also be inferred from admitted knowledge of the situation and directives to local Michelin officials by the regional corporate sales manager, who reported directly to and took orders from Mr. Duleyrie. Michelin's own theory of the termination—that it was merely responding to the disillusionment of other dealers stemming from Bostick's lack of service facilities—implicitly recognizes that the termination was something more than a unilaterally motivated action. Thus, even absent an express "concession" from Mr. Duleyrie, a reasonable jury could find " 'causal nexus' " between the complaints and the termination without speculating about the involvement of rival dealers. Roesch v. Star Cooler, supra, 514 F.Supp. at

---

11. When questioned about Bostick's lack of service facilities as a basis for termination when other dealers without service facilities were assertedly allowed to continue, Mr. Du-

leyrie stated that "we took exactly the same type of action that was taken in the Bostick oil case" in terminating Rice as a dealer.

894. Indeed, the Seventh Circuit in a highly lucid discussion of § 1 liability predicated upon termination of a dealer has held "that proof of termination following competitor complaints is sufficient to support an inference of concerted action." *Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226, 1238 (7 Cir.1982). And we have previously found that a termination even more unilateral in nature could constitute a § 1 violation if it evinces sufficient anticompetitive character. *Osborn v. Sinclair Refining Company,* 286 F.2d 832, 837 (4 Cir.1960), cert. denied, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961).[12]

■ It is ultimately, then, a factual issue for the jury to determine whether Bostick was terminated to placate rival dealers objecting to price-cutting, or instead for lack of service facilities as Michelin claims.[13] The question next to be considered is whether termination for either purpose is a violation of § 1.

■ The answer is found in *Rice,*[14] where we said:

[W]e think it is important to distinguish between a conspiracy among dealers and their supplying manufacturer for the purpose of retail price maintenance that would benefit the dealers and one involving the same parties but redounding primarily to the benefit of the manufacturer as a result of increased interbrand competition. A restraint imposed by the former conspiracy would be horizontal in nature and *per se* illegal, while one imposed by the latter would be vertical and analyzed under the rule of reason.

638 F.2d at 16. On the authority of *Rice,* we conclude that a finding of *per se* violation of § 1 would result from a factual determination that the termination was in furtherance of competitors' desires to eliminate a price-cutting rival. *Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404, 411–13, (6 Cir. 1982); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). While we are not unmindful that a *per se* label should not be mechanically applied, *Broadcast Music, Inc.*

12. Michelin contends that to rule for Bostick we must necessarily embrace an expansive reading of *Girardi v. Gates Rubber Company Sales Division, Inc.,* 325 F.2d 196 (9 Cir.1963), and that *Girardi* has been sapped of precedential value by universal criticism. Neither is true. *Girardi* perhaps can be read quite broadly as in effect creating a presumption of combination or conspiracy whenever distributors' complaints are followed by a supplier's termination of the disfavored rival distributor. But we need not adopt such a presumption here to require submission of the case to the jury in the face of other evidence, beyond bald complaints, upon which a causal connection between the competitors' objections to price-cutting and the termination could be found. Also, those cases cited as rejecting *Girardi, see, e.g., Roesch v. Star Cooler, supra,* 671 F.2d at 1172; *E.J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 478 F.Supp. 243, 256 (E.D.Pa.1979), aff'd, 637 F.2d 105 (3 Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), in actuality only criticize the expansive view of that case, while preserving the narrower point that such other evidence as we find here will be enough to raise an issue of fact regarding § 1 concerted activity. And the Seventh Circuit has refused to follow the stringent proof requirements set out in *Sweeney, see Spray-Rite, supra,* 684 F.2d at 1238–39, while the authority of *Roesch* is in

doubt pending the Eighth Circuit's resolution of its in banc hearing. *See supra* note 9; *Spray-Rite, supra,* 684 F.2d at 1239 n. 7.

13. Or, for that matter, for a third reason as yet undisclosed by Michelin.

14. Bostick does not challenge on appeal the service clause in his Dealer Sales Agreement as itself an unreasonable restraint of trade, as did the plaintiff in *Rice.* The district court in *Rice* had found that defendant's evidence, *in rebuttal* to the plaintiff's evidence of a horizontal combination among rival dealers, showed that Rice had underspent on Michelin promotional activities and, although maintaining "adequate" service facilities, had effectively shifted much of the tire service and repair work it could have been expected to perform on to other dealers. 483 F.Supp. at 757–59. These service and promotional deficiencies therefore were found to create a "free-rider" problem, *see, e.g., GTE Sylvania, supra,* 433 U.S. at 55, 97 S.Ct. at 2560, justifying enforcement of Michelin's contractual requirements, and hence the termination of Rice. But the reasonableness of the clause did not come into question until a *prima facie* case of a horizontal combination as the impetus to the termination had first been shown.

*v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 9, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979); *National Electrical Contractors Assoc., Inc. v. National Constructors Assoc.,* 678 F.2d 492, 500 (4 Cir.1982), where the facts support a finding that competing distributors provoked a manufacturer to eliminate one of their number as a marketplace competitor, there is no need to proceed to the more finely tuned "rule of reason" analysis that is proper when considering manufacturer-imposed vertical restrictions like the tire service requirement in *Rice.*

Of course, it is possible that the jury will reject Bostick's proof and instead find that termination occurred for the reasons Michelin claims. Michelin has yet to put on its proof, and had, by cross-examination, only begun to draw out evidence to support its defense. In *Rice,* by way of illustration, Michelin eventually failed to convince the trier of fact of the applicability of two of the three explanations for viewing the termination as a vertically imposed manufacturers' restraint promoting competition against other tire brands.[15] Only the "free rider" justification was proven, a justification yet to emerge as applicable here; although some rival dealers' dissatisfaction with Bostick apparently stemmed from the perception that Bostick's minimal service facilities allowed it a cost advantage, at least one dealer claimed a benefit from an expansion in the service portion of his business. Whether provision of Michelin service paid for itself or even produced a profit for other dealers will be a matter the parties will be free to explore at a new trial. We find only that the evidence so far submitted rendered the court's grant of a directed verdict erroneous.

### B.

■ Analysis of the National Accounts program presents no problem in finding the concerted action element of a § 1 violation, as the program itself was a contractual agreement between Michelin and various of its dealers including Bostick.[16] More difficult is the issue of whether the program operated as an unreasonable restraint of trade. The district court reasoned that the program fell short of a *per se* illegal resale price maintenance arrangement, *see, e.g., Parke, Davis, supra,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 for two reasons: (1) the program was voluntary in that dealers could join or not, or only partially, and remain dealers, and (2) no minimum resale price was set by Michelin given that Bostick could effectively alter the final sales "price" by rebating to his customers. Were these two salient features of the National Accounts program uncontestably true, we would agree with the district court that a central billing program by a manufacturer is not *per se* illegal under the Sherman Act.[17] *See Ohio-Sealy Mattress Manufac-*

---

**15.** In *Rice,* the district court considered whether Michelin's actions fell within any of the three rationales discussed in *GTE Sylvania, supra,* 433 U.S. at 55–56, 97 S.Ct. at 2560, as justifying restrictions or policies enhancing competition among different product manufacturers ("interbrand") at the expense of lessened competition among dealers of the same brand ("intrabrand"). These rationales were (1) inducing aggressive retailers to become dealers to enhance the manufacturer's likelihood of successful entry into a new market, (2) stemming the "free rider" effect, *see supra* note 13, and (3) assuming direct manufacturer oversight of quality and safety to lessen product liability exposure. In affirming *Rice,* we noted carefully that such actual positive benefits must be shown before a restraint imposed by a manufacturer is accorded the deference of a "rule of reason" analysis. 638 F.2d at 16.

**16.** In addition, the program appears to be the kind of arrangement in which no single dealer can be sufficiently assured of not losing a competitive advantage in joining unless competing dealers also join. To this extent there is an additional element of "combination" involved, *see Albrecht, supra,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998, one which goes "beyond mere announcement of [the manufacturer's] policy and the simple refusal to deal" allowed under the doctrine announced in *Colgate, supra,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. *Parke, Davis, supra,* 362 U.S. at 44, 80 S.Ct. at 511.

**17.** Because of the posture of this case we are not called upon to determine whether the potential for resale price maintenance of a central pricing and billing system is justified as in effect creating a new "product", *see, e.g., B.M.I. v. C.B.S., supra,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1, or as promoting interbrand

turing Co. v. Sealy, Inc., 585 F.2d 821 (7 Cir.1978), cert. denied, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); cf. B.M.I. v. C.B.S., supra, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1. But the evidence so far presented permitted a contrary finding.

The voluntariness of the program in a formal sense was not a proper basis for the granting of a directed verdict when Bostick had introduced sufficient evidence of Michelin's efforts to pressure it into joining the program unwillingly. Such evidence can be found in the simultaneous refusal of Michelin to disclose its intention to renew or terminate the dealership while vigorously promoting the virtues of the National Accounts program; the delay in formalizing renewal past the usual May 29 anniversary until mid-June in 1977, after Bostick had made its first sale through the National Accounts program and had begun to express an interest in participating; and to some degree Joe Bostick's own account of feeling "intimidated" by Michelin representatives at pre-renewal meetings where the possibility of termination for failure to join the National Accounts program was assertedly conveyed to him.[18] Moreover, although large-volume customers were ostensibly free to choose to join the program and dealers free to solicit national accounts for business, Michelin soon became critical of Bostick's active promotion of itself as a National Accounts dealer.

As to Michelin's lack of control over the ultimate sales price, the evidence is not at all clear that Michelin anticipated the availability of an "end run" around the central pricing and billing system directly to the customer through rebates by Bostick. Even if the potential for dealer rebating was perceived in advance, Michelin personnel showed considerable disenchantment with Bostick's continued price-cutting. That Bostick was eventually able to turn the program to its advantage once enrolled does not imply that its participation was not

initially urged as a means of dampening its ability to discount. The record reveals frustration and attempts by Michelin during 1977–78 to exert indirect pressures on Bostick to curtail its sales practices. A jury could reasonably conclude that the nonrenewal in May 1978 was a last resort by Michelin to bring a maverick into line and make the National Accounts program as enforced an effective barrier to dealer price competition.

Accordingly we conclude that proof of an illegal resale price maintenance arrangement does not rest upon a showing that the National Accounts program in its structure on paper restricts market pricing if in practical effect the "coercive potential of summary termination" keeps discounting dealers in line. Greene v. General Foods Corp., 517 F.2d 635, 658 (5 Cir.1975), cert. denied, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976). Price maintenance schemes have been consistently condemned as per se illegal, Arizona v. Maricopa County Medical Society, —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); Albrecht, supra, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998; Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); United States v. Trenton Potteries, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), and are not saved by claims of redeeming interbrand virtues when there is sufficient evidence of their initiation at the instigation of horizontally competing entities. United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Michelin, of course, is not generally a dealers' collective or joint venture of competitors. But in establishing a National Accounts billing program involving review of dealers' customer lists, the setting of uniform prices to all participating customers, the potential for insulation of the dealer from the customer in pricing matters, and an opportunity for monitoring dealers'

---

competition through economies of scale in a manner that cannot be achieved through less restrictive alternatives, see e.g., GTE Sylvania, supra, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568.

18. See supra note 8.

sales tactics and policies in greater depth, it has taken on this role of a regulator of the horizontal competition among otherwise legally distinct dealerships selling tires they legally own.[19] *See United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). If the cancellation of Bostick is found to have been for the reasons claimed in this suit, a violation of § 1 of the Sherman Act was committed.

### C.

■ From the foregoing the outlines of a third view of the evidence becomes clear without need for great elaboration. Even if the National Accounts program itself was insufficient to constitute a resale price maintenance arrangement, Michelin's insistence on Bostick's participation can be understood as a first attempt to carry out the wishes of competing dealers. As Bostick's discounting continued, so did complaints. The ultimate cancellation of only Bostick's truck dealership was a more drastic second step in an essentially horizontal effort to remove downward pressure on Michelin truck tires. That Michelin offered to continue Bostick as a passenger and light truck tire distributor could be taken as signaling a desire to take steps strong enough to placate other dealers but not so drastic as to lose itself a highly effective dealer outright.[20] Viewing Michelin's entire course of dealing with Bostick as a consistent two-stage progression, a jury could find the termination in furtherance of a horizontal combination with anticompetitive effect.[21]

### III.

Bostick also urges that the facts underlying its Sherman Act claims equally support a finding of liability under the South Carolina Unfair Trade Practices Act, § 39–5–10 *et seq.,* Code of Laws of South Carolina 1976. Specifically, § 39–5–20(a) provides:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

Bostick contends that a jury could have found that its nonrenewal was "contrary to equity and good conscience", *deTreville v. Outboard Marine Corporation,* 439 F.2d 1099, 1100 (4 Cir.1971), or, alternatively, that in dealing with Bostick, Michelin went beyond a unilateral refusal to deal to seek compliance with an anticompetitive price maintenance arrangement.[22] The district court dismissed this count on a variety of grounds which we consider in turn.

> The jury could thus infer that Michelin was instead responding to the pressures from Bostick's competitors, who had more reason to oppose strong intrabrand competition than Michelin, especially if it doubted Michelin's service-related justification in this case.

19. Indeed, the apparent justification for Michelin acting as billing clearinghouse for its dealers is that joint efforts in this area benefit dealers as a whole.

20. Michelin suggested at oral argument that Bostick's various "Dr. Tire" retail outlets provided sufficient service facilities to satisfy the Dealer Sales Agreement. This may be established on remand; evidence currently in the record is at best minimal on this point, and certainly inconclusive.

21. Further supporting this conclusion is the Supreme Court's observation in *GTE Sylvania, supra,* 433 U.S. at 56, 97 S.Ct. at 2560, that many economists "have argued that manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products." Because the National Accounts program dampens intrabrand price competition, which is only then reinvigorated by rebating, it could follow that it was contrary to Michelin's interests standing alone to terminate an effective intrabrand competitor like Bostick.

22. Bostick advanced two other Unfair Trade Practices Act-based theories which are no longer tenable in this case. One was that Michelin fraudulently induced Bostick to enter the National Accounts program, a claim identical to that dismissed with prejudice below by agreement of the parties. We think that Bostick is foreclosed from reopening its fraud claim under a different heading here on appeal. The other was that Michelin restricted the territory of its dealers or to whom the product could be transferred. Bostick, however, failed to offer any proof of this, aside from perhaps a strained view of the potential of the National Accounts program as a means of overseeing dealer-customer contact. These theories were properly dismissed.

**[11]** Most quickly disposed of is the district court's passing suggestion that federal law preempted application of the South Carolina Unfair Trade Practices Act. This position is untenable, and Michelin makes little effort to defend it here. Nothing in the nearly century-old history of federal antitrust regulation is cited to us to suggest that Congress has manifested a clear intent to displace state regulation of unfair trade practices. *See* 1 P. Areeda & D. Turner, Antitrust Law ¶ 208 (1978). *Cf. New York State Dept. of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 2512, 37 L.Ed.2d 688 (1973); *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943).

To the extent the district court relied on the inverse proposition, that the state law exempts from its coverage all federally regulated conduct, the following language of § 39–5–40 governs:

> Nothing in this article shall apply to:
>
> \*    \*    \*    \*    \*    \*
>
> (d) Any challenged practices that are subject to, and comply with, statutes administered by the Federal Trade Commission and the rules, regulations and decisions interpreting such statutes.
>
> For the purpose of this section, *the burden of proving exemption from the provisions of this article shall be upon the person claiming the exemption.*

(emphasis added). As Bostick points out, Michelin failed to raise this defense in its answer. The above language appears to require the party claiming exemption to raise § 39–5–40(d) affirmatively,[23] such

that the defense is untimely when first raised on motion for directed verdict. Rule 8(c), Fed.R.Civ.P.; *Hardy-Latham v. Wellons,* 415 F.2d 674, 677 (4 Cir.1968).

■ Even if considered properly raised as more akin to a defense of failure to state a claim upon which relief can be granted and hence timely, Rule 12(h)(2), Fed.R. Civ.P., this exemption is not available to Michelin on the ground of its action being "subject to, and comply[ing] with" F.T.C. rules, regulations and interpretations. No case has been pointed to of Federal Trade Commission approval of the type and manner of dealer termination alleged here. Instead, some terminations are found lawful, others not, on a case-by-case basis. *Compare Naifeh v. Ronson Art Metal Works, Inc.,* 218 F.2d 202, 206 (10 Cir.1954) (simple refusal to deal not illegal), *with Adolph Coors Company v. F.T.C.,* 497 F.2d 1178, 1185–86 (10 Cir.1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975) (conduct going beyond a simple refusal to deal found illegal where distributorship terminated for anti-competitive purpose). Section 39–5–40 instead runs to activity given a blanket exemption or endorsement by federal law.

In *State ex rel. McCleod v. Rhoades,* 275 S.C. 104, 267 S.E.2d 539, 541 (1980), the South Carolina Supreme Court found certain allegedly unfair stock trading practices to be within the regulatory scheme of the Securities and Exchange Act of 1934 and therefore exempted from the Unfair Trade Practices Act.[24] By contrast, where the less comprehensive Federal Motor Vehicle Information and Cost Savings Act was assert-

---

**23.** Dealing with a pendent state law claim, we look to state law for guidance on whether the defense is affirmative in nature. *Freeman v. Chevron Oil Company,* 517 F.2d 201, 204 (5 Cir.1975). As Professor Day of the University of South Carolina School of Law has summarized the procedural status of § 39–5–40, "Proof of an exemption is clearly an affirmative defense." Day, The South Carolina Unfair Trade Practices Act: Sleeping Giant or Illusive Panacea?, 33 S.C.L.Rev. 479, 501 n. 147 (1982).

**24.** Strictly speaking, *Rhoades* addressed only the exemption provided for in § 39–5–40(a) regarding "actions or transactions permitted un-

der laws administered by any regulatory body" of the state or the United States, and not 40(d) claimed by Michelin. As 40(d) apparently has not been interpreted by the South Carolina Supreme Court, the treatment of the broader exemption of 40(a) discussed in the text gives guidance on the scope of the entire section. It follows that if the cause of action against Michelin is not exempted under the broader view of actions "permitted" by other law, it also fails to meet the stricter demands of alleging acts subject to and complying with criteria set forth by the FTC, itself a regulatory body administering federal law.

ed to have exempted allegedly fraudulent automobile odometer setting practices from state law coverage, the court found that "the Federal Act clearly reveal[s] it was not intended to supersede or otherwise limit state law remedies". *State ex rel. McCleod v. Fritz Waidner Sports Cars, Inc.*, 274 S.C. 332, 263 S.E.2d 384, 385 (1980).

Interpretation of the Act, though scant, indicates that the exemption relates only to fields extensively governed by federal law, where federal preemption might otherwise already apply. As discussed, we do not view the body of federal antitrust law as preemptive in this way, and therefore no exemption arises merely by virtue of Michelin's asserting that its conduct in a particular case might not be illegal under federal law. Michelin thus has failed to carry its burden of proving an exemption under § 39–5–40.

▮ Looking then to the merits of Bostick's state law claim, we conclude that the district court overly restricted the Act's coverage to only those practices which would be unlawful under § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1).[25] The Act instead states only that "the courts will be *guided* by the interpretations given" to the federal FTC Act. § 39–5–20(b) (emphasis added). This language neither revokes pre-existing South Carolina definitions of unfair or deceptive trade practices, nor binds the Act to the scope of federal law. Pertinent, then, is our statement of South Carolina law applicable to a claim of wrongful franchise termination:

Although some states may give full effect to broad unilateral powers of termination, South Carolina, whose law governs here, does not. It is settled law in that state that regardless of broad unilateral termination powers, the party who terminates a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience. That standard of conduct is far more stringent than one forbidding only actual fraud, and it may apply to an unconscionable reason for termination as well as to the causing of needless injury in the course of termination.

*deTreville v. Outboard Marine, supra*, 439 F.2d at 1100 (citations and footnote omitted). The principle that proof sufficient to sustain a finding of fraud need not be prerequisite to establishing an unfair trade practice has been applied directly to the Act. *State ex rel. McCleod v. Brown*, 294 S.E.2d 781, 783 (S.C.1982).

▮ Accordingly, evidence sufficient to withstand a motion for directed verdict on the federal causes of action provides at least as sufficient a basis for also requiring jury determination of the state law claim. Moreover, there is no requirement in the Unfair Trade Practices Act of a contract, combination or conspiracy as there is under § 1 of the Sherman Act. It is therefore entirely possible that the jury could find Bostick to have been terminated in furtherance of unfair or anticompetitive purposes—*e.g.*, to harm its business because of its role as a growing wholesale competitor of Michelin's—without rendering a verdict duplicative of the federal claims. It is, of course, proper that the jury be instructed not to award duplicative damages for violations of both the state and federal statutes based upon precisely the same conduct, and the defendant will be free to ask for an instruction to this effect. But dismissal of the Unfair Trade Practices Act claim as a matter of law was incorrect here.

## IV.

Bostick contends that the district court committed reversible error in excluding

---

**25.** Indeed, read this way the Act truly would be redundant and, in some cases, possibly in conflict with federal law. Instead, "the statutory mandate to follow federal interpretations of the FTC Act indicates that state courts 'are now free to find methods, acts or practices not heretofore specifically declared unlawful by the FTC or the federal courts prohibited by the

[UTPA] ....'" Day, The South Carolina Unfair Trade Practices Act, *supra* note 23, 33 S.C.L.Rev. at 482, quoting *Murphy v. McNamara*, 36 Conn.Supp. 183, 187 n. 4, 416 A.2d 170, 174 n. 4 (1979) (interpreting identical language in Connecticut's Unfair Trade Practices Act).

from evidence a memorandum written by Michelin's district manager on May 7, 1977, offered as plaintiff's Exhibit 42. The memorandum concerned plaintiff's sales activities and was prepared by defendant's district manager to set forth his comments and recommendations for the use of his corporate superior. The district court originally found admissible all but two paragraphs of the memorandum,[26] and ruled that the exhibit would be admitted if plaintiff agreed to delete those two paragraphs. However, when defendant continued to press its objection, the district court ruled the entire document inadmissible on a variety of grounds.

Even if admissible, we do not think that the ruling excluding this evidence would be reversible error because the statements it contains are largely cumulative of other evidence regarding the district manager's reports and recommendations to defendant's management. We would thus not consider the point were it not that we order a retrial at which it is not unlikely that the exhibit will be offered again.

In our view the memorandum is admissible as an admission, under Rule 801(d)(2)(C) and (D), Fed.Rules of Evidence, whether or not unfavorable to defendant, provided that it is shown either (a) that the district manager was authorized to make a statement concerning the subject, or (b) that the memorandum was made by defendant's agent concerning a subject within the scope of his agency during the existence of the agency relationship. If either of those conditions is met, the district court, on retrial, should admit the memorandum as an exhibit. The statement's status as a non-hearsay admission does not turn, as the district court believed, on proof that a company superior actually relied on the memorandum. Of course, the admissibility of the memorandum is subject to the limitations of Fed.R.Evid. 402 and 403, that it be relevant and that its probative value not be substantially outweighed by the danger of unfair prejudice, confusion of the issues, etc. Thus the district court may properly require the memorandum to be redacted either because portions are irrelevant or would result in the evils protected against by Rule 403, or both. In that event, however, the elimination of the improper material should be made by the district court without requiring the plaintiff's agreement and the balance should be admitted.

REVERSED AND REMANDED.

---

26. The two paragraphs ruled inadmissible allegedly related solely to the sale of passenger tires and were ruled irrelevant because the alleged antitrust violations all related to the sale of truck tires.