ITCO CORPORATION, Appellant,

v.

MICHELIN TIRE CORPORATION, COMMERCIAL DIVISION,
Appellee.

and

State of North Carolina, Amicus Curiae.

ITCO CORPORATION, Appellee,

v.

MICHELIN TIRE CORPORATION, COMMERCIAL DIVISION,
Appellant.

Nos. 82–2177, 82–2178.

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1983.
Decided Nov. 23, 1983.

Charles Gordon Brown, Chapel Hill, N.C. (Jordan, Brown, Price & Wall, John R. Jordan, Jr., Jordan, Brown, Price & Wall, Chapel Hill, N.C., Samuel W. Johnson, Meadows, Johnson & Spinks, Rocky Mount, N.C., John F. Dienelt, Brownstein, Zeidman & Schomer, Washington, D.C., on brief), for appellants.

J. Brantley Phillips, Jr., Natalma M. McKnew, Greenville, S.C. (Fletcher C. Mann, Leatherwood, Walker, Todd & Mann, Greenville, S.C., Jerry S. Alvis, Young, Moore, Henderson & Alvis, Raleigh, N.C., on brief), for appellee.

Rufus L. Edmisten, Atty. Gen. of North Carolina, H.A. Cole, Jr., Sp. Deputy Atty. Gen., John R. Corne, Associate Atty. Gen., Raleigh, N.C., on brief, for amicus curiae.

Before RUSSELL and MURNAGHAN, Circuit Judges and BULLOCK,* District Judge.

MURNAGHAN, Circuit Judge:

The case affords us a third opportunity to consider the antitrust implications of Michelin Tire Corporation's decision to terminate dealership arrangements with certain of its large dealers. The aggrieved dealer-plaintiff may have differed in each of the cases, but our views on the substantive law have held fast, since the first time, *see Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15 (4th Cir.1981),[1] and since the second time, *see Bostick Oil Co. v. Michelin Tire Corp.,* 702 F.2d 1207 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983),[2] we considered such matters. Cases, however, frequently turn

* The Honorable Frank W. Bullock, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

1. In *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15 (4th Cir.1981), involving a Maryland Michelin dealer, a case decided after a full scale trial below, not upon summary judgment or directed verdict, we affirmed the district court's judgment in favor of the defendant, Michelin. Rice, like ITCO here, brought suit after Michelin decided to terminate its authorized dealership. We affirmed the judgment in *Rice* for Michelin on the ground that the district court, as the factfinder, could reasonably conclude that, as between Michelin and the party before the court, Rice, the termination was "for the purpose of promoting interbrand competition," 638 F.2d at 17, and thus for a purpose not prohibited by the federal antitrust laws.

2. In *Bostick Oil Co. v. Michelin Tire Corp.,* 702 F.2d 1207 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983), we reversed and remanded for further proceedings the trial court's granting of a directed verdict for the defendant, Michelin, on the grounds that circumstances required a full-scale explanation of the facts by trial as between Michelin and Bostick Oil Co. As will become increasingly apparent in the course of this opinion, ITCO's claim in the case before us closely par-

not on the substantive law that must guide decision but, instead, on their particular procedural countenances. Indeed, the novel and dispositive question facing us, in the end, is one sounding in civil procedure and concerning the scope of the doctrine of *res judicata.*

I

ITCO Corporation, the plaintiff and appellant, is an independent tire distributor whose headquarters are located in Wilson, North Carolina. In the spring of 1974, ITCO responded to advertisements placed by Michelin, the defendant and appellee, which sought dealers for Michelin's radial tires in the United States. At the time, Michelin, a New York corporation whose parent entity is of French origin, was embarking upon a full scale effort to develop markets, a campaign the details of which may be found in the district court opinion in *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 483 F.Supp. 750, 752–53 (D.Md.1980),

allels, and indeed appears indistinguishable from, Bostick's lawsuit. Bostick, terminated in circumstances similar to those presented here, brought suit alleging that Michelin's decision to terminate the dealership arrangement was a horizontal restraint prohibited by § 1 of the Sherman Act and by the South Carolina Unfair Trade Practices Act, § 39–5–20(a), Code of Laws of South Carolina 1976. We held:

> It is ultimately, then, a factual issue for the jury to determine whether Bostick was terminated to placate rival dealers objecting to price-cutting [by Bostick], or instead for lack of service facilities as Michelin claims.... [A] finding of *per se* violation of § 1 would result from a factual determination that the termination was in furtherance of competitors' desires to eliminate a price-cutting rival.

702 F.2d at 1215. We went on to hold, as well, that Bostick's claim under the South Carolina act necessarily would prevail if the Sherman Act claim prevailed:

> [E]vidence sufficient to withstand a motion for a directed verdict on the federal causes of action provides at least as sufficient a basis for also requiring jury determination of the state law claim.... It is, of course, proper that the jury be instructed not to award duplicative damages for violations of both the state and federal statutes based upon precisely the same conduct, and the defendant will be free to ask for an instruction to this effect.

702 F.2d at 1220.

*aff'd,* 638 F.2d 15 (4th Cir.1981). After several meetings and communications, Michelin and ITCO entered into a standard "Dealer Sales Agreement" dated September 25, 1974. The agreement, which by its terms was to expire automatically at the end of a one-year period, was renewed on April 23, 1975, on January 27, 1976, and on January 27, 1977.

Pursuant to the agreement, ITCO obligated itself to "vigorously and aggressively promote the retail sale of Michelin Products and ... render prompt, workmanlike and courteous service with respect to Michelin Products including all services to which a purchaser of Michelin Products from any authorized Michelin source may be entitled." The agreement also required that ITCO "establish and maintain a place of business satisfactory to [Michelin] in appearance, size, layout and equipment and at all times be in a position to adequately and professionally service Michelin Products."

On December 22, 1977, ITCO was informed by Michelin that the dealership agreement would not be renewed again. The crucial factual question, as yet unresolved, asks why Michelin decided to terminate its dealership arrangement with ITCO.[3] It is a factual dispute the resolution of which, as we acknowledged in our *Bostick* decision and in our *Rice* decision, will dictate whether the termination decision constitutes anticompetitive behavior rendered *per se* unlawful under § 1 of the Sherman Act, *see Bostick, supra,* at 1215 (and hence a violation of North Carolina's Unfair Trade Practices Act, N.C.Gen.Stat. § 75–1.1), or, instead, a legitimate business decision with socially beneficial ramifications, *see Rice, supra,* at 17.

Michelin contends, as it did in the *Bostick* case with respect to its termination of Bostick Oil Company as a dealer, that its decision to sever its relationship with ITCO was a unilateral choice stemming solely from a disenchantment with ITCO's performance as a dealer. Specifically, Michelin maintains that ITCO failed to provide any retail tire services in Charlotte, North Carolina, thus falling short of its contractual obligation to sell and service Michelin Products "in a first class manner."

And indeed, ITCO does not contest the fact that the absence of retail services in Charlotte had become a matter of dispute, discussion, and negotiation between the parties. But ITCO steadfastly maintains, as did Bostick Oil Company, that the issue of retail service was an entirely minor concern, and not the real reason underlying Michelin's decision to sever its relationship with the dealer. Rather, ITCO intends to prove, as Bostick intended to prove, that the termination decision was the action of an anticompetitive conspiracy among ITCO's rival dealers and Michelin itself—a combination calculated to fix prices in the retail tire market. According to its own version of the facts, ITCO, as a large and cost-efficient seller of tires both at the retail and wholesale level, could purchase tires in exceedingly large quantities from Michelin. Because of its high-volume purchases, ITCO was able to obtain especially lucrative benefits under Michelin's pricing system, which grants price discounts that, generally speaking, rise in tandem with the number of tires purchased by a dealer.[4]

---

**3.** On appeal, Michelin advances the argument that the district court resolved this factual dispute, and opted for Michelin's version of the story. The contention mistakes the role of the court in ruling on a motion for summary judgment. The court is not permitted to *resolve* genuine issues of material fact on a motion for summary judgment—even where, as below, both parties have filed cross motions for summary judgment. Where genuine issues of material fact are revealed, the duty of the court is to deny summary judgment and to permit the case to go to trial. *See, e.g., Smith v. Universi-*

*ty of North Carolina,* 632 F.2d 316, 338 (4th Cir.1980).

**4.** A discount of as much as 10 percent, called the "quantity shipping allowance," was made available on each shipment, the exact size of the discount dependent upon the size of the order. Another discount, termed the "volume bonus purchase," was given on the basis of the total annual purchases made by the dealer. That discount, it is said, reached a maximum of five percent. A two percent discount was given to those dealers who paid their bills in cash

According to ITCO's calculations, a dealer able to obtain the full panoply of discounts offered by Michelin could receive an aggregate discount of 44.28 percent off of Michelin's suggested retail prices. While the record is not fully developed at this pretrial stage of the case, it is alleged that ITCO obtained discounts nearing or reaching that maximum figure.

ITCO contends that, by virtue of the discounts it received, it found itself in a competitively advantageous situation vis-à-vis most other authorized Michelin dealers. Not only could ITCO effectively undercut the prices offered by the smaller authorized dealers in the *retail* consumer market, but ITCO also could compete effectively with Michelin itself in the *wholesale* market, on sales to retail tire merchants who had not entered a dealership agreement with Michelin. Both phenomena, it is alleged, drew the ire of ITCO's competitors, authorized dealers who thus faced increased competition on the one hand from ITCO, and on the other hand, from unauthorized retail dealers who purchased tires from ITCO at wholesale prices lower than those offered to the complaining, authorized, dealers by Michelin.

Crucially, for antitrust purposes, it is alleged that ITCO's disenchanted competitors aired their gripes to Michelin in what amounted to a call for protective action from the manufacturer. ITCO directs our attention to a notation made by Michelin's district manager which purportedly logs one such complaint:

> Dealer very upset over the large amount of wholesaling taking place in his area. Retail selling prices he claims are floating at 20 to 30% below suggested exchange. Wholesale selling prices are normally at 30 + 5 off.

Michelin responded to the lament of the smaller dealer, ITCO asserts, by deciding to terminate its dealer arrangements with four similarly situated large dealers—ITCO itself, Bostick, Rice, and Englewood Tire Distributors. In support of that contention, ITCO points to a memorandum written by Michelin's district manager, recommending that the manufacturer terminate its dealings with the "large wholesalers" and, in particular, with Bostick:

> I feel that in the long run, we would be better off without the large wholesaler such as Bostick Oil Co., Inc. ... [T]he overall morale of the rest of our dealers in this area would improve considerably.

The memorandum goes on to suggest, albeit less than directly, that the disenchantment of rival dealers with the price-cutting actions of the "larger wholesalers" figured in the decision:

> Another greater possibility is that another large wholesaler would simply see a great opportunity and pick up where Bostick left off [if Bostick alone were terminated]. Due to this, it would appear to me that if a move is made to get rid of the large wholesalers whom we are in competition with, this move would have to be made throughout other areas as well. In other words, I find it difficult to see how we could ever be selective as just what wholesalers we are going to keep.

In concluding, the memorandum listed the largest wholesalers in the Charlotte, North Carolina district. Bostick was listed. So was ITCO.

Perceiving a colorable claim under the antitrust laws, ITCO brought suit in the United States District Court for the Eastern District of North Carolina, alleging that Michelin's decision to terminate the dealership arrangement presented a conspiracy in restraint of trade prohibited by § 1 of the Sherman Act, 15 U.S.C. § 1. Availing itself of the district court's pendent jurisdiction, *see United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and, in the alternative, the court's diversity jurisdiction, 28 U.S.C. § 1332,[5]

within a certain period of time. And there was a "standard dealer discount" given to every dealer by Michelin. In 1977, the standard discount was 33.5 percent off of the suggested retail price.

5. The matter, it appears, was not explored in the district court. The record fails to reveal Michelin's principal place of business and, thus, it cannot be said with certainty that the parties are of diverse citizenship.

ITCO also alleged that Michelin's decision constituted a violation of North Carolina's Unfair Trade Practices Act, N.C.Gen.Stat. § 75–1.1. ITCO moved for and obtained a temporary restraining order prohibiting Michelin from implementing its decision to terminate ITCO, thus leaving the parties *in statu quo* while the lawsuit progressed.[6] In the wake of that order, Michelin filed a counterclaim charging ITCO with abuse of legal process, a common law tort under the law of North Carolina. According to Michelin, ITCO sought, obtained, and used the TRO to further an unlawful and abusive purpose.

The parties filed cross motions for summary judgment. Perceiving potential merit in ITCO's Sherman Act claim, the district court denied Michelin's motion and determined that the claim should proceed to trial. The court did, however, grant summary judgment for Michelin on the state unfair trade practices claim. Desirous of an immediate appeal on the defeat of its state law count,[7] ITCO voluntarily dismissed with prejudice its Sherman Act claim so that the district court might then enter a final and appealable judgment. As the record shows, however, ITCO dismissed its federal claim on the understanding that whatever antitrust arguments it might have made under the Sherman Act that also are cognizable under the North Carolina act would remain available in the event of success on appeal and a subsequent trial after remand.

ITCO received summary judgment in its favor on Michelin's abuse of process counterclaim. Both parties have filed notices of appeal on those decisions rendered adversely to their respective interests, and the case is properly before us for resolution.

## II

The larger question we must answer in ITCO's appeal is whether the district court was in error when it granted summary judgment for Michelin on ITCO's unfair trade practices claim. That question necessarily entails several subsidiary inquiries.

### A

The North Carolina Unfair Trade Practices Act, N.C.Gen.Stat. § 75–1.1, provides broad-sweeping language:[8]

Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

A private cause of action is made available to an injured party. *See* N.C.Gen.Stat. § 75–16; *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 715 (4th Cir.1983). Especially inviting the attention of potential plaintiffs, in addition to the broad substantive coverage of the act, are

---

**6.** The TRO was once extended and finally dissolved. ITCO, the record reveals, withdrew its motion for a preliminary injunction that would have supplanted the TRO and extended that order's effects.

**7.** A request for certification of the legal issues presented under 28 U.S.C. § 1292(b) was denied by the district court.

ITCO's purpose in seeking immediate review of the defeat of its state law claim will become increasingly evident as this opinion develops. Suffice it to say that, under ITCO's understanding of the scope of the North Carolina Unfair Trade Practices Act, there is no relief and no legal theory available under the Sherman Act count which would not also be available under the state act. Conversely, however, there might be legal theories to pursue under the state act which the Sherman Act would not recognize. The economics of litigation, along with the not unique desire to go to trial with, as ITCO's

counsel put it at oral argument, a full quiver of arrows, prompted ITCO's decision to pursue a prompt appeal.

**8.** As we had occasion to point out in *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 715 n. 3 (4th Cir.1983), the North Carolina act originally provided that the unfair or deceptive act occur "in the conduct of any trade or commerce." The 1977 deletion of the act's reference to "trade" and broadening of the act's scope to cover acts "in or affecting commerce," has been held to be a substantive change in the act which should not be applied retroactively. *See United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F.Supp. 1049, 1057 (E.D.N.C.1980), *aff'd*, 649 F.2d 985 (4th Cir. 1981).

No significance is attached to the statutory amendment by the parties here on appeal, and we are unable to perceive any significance pertinent to the matters necessary to our decision.

**48**

provisions for the awarding of treble damages, see N.C.Gen.Stat. § 75–16, and, in appropriate cases, attorneys fees, see N.C.Gen. Stat. § 75–16.1. *See generally* Note, *Trade Regulation—N.C.Gen.Stat. § 75–1.1—Unfair or Deceptive Acts or Practices in the Conduct of Trade or Commerce,* 12 Wake Forest L.Rev. 484 (1976); Note, *Consumer Protection and Unfair Competition in North Carolina—The 1969 Legislation,* 48 N.C.L. Rev. 896 (1970).

■ ITCO sets forth several theories under which it believes Michelin could be held liable under the unfair trade practices act, but we need only discuss one of those theories. ITCO asserts that anticompetitive actions which run afoul of the proscriptions of the Sherman Act—in particular, actions in furtherance of a horizontal conspiracy to fix prices—are also actions banned by the North Carolina act. We agree.

Highly persuasive to us is the fact that the substantive provisions of the North Carolina act are reproduced *verbatim* from § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and that the North Carolina Supreme Court, consistent with that observation, had held that "[b]ecause of the similarity in language, it is appropriate for us to look to the federal decisions interpreting the FTC Act for guidance in construing

the meaning of ... § 75–1.1," *Johnson v. Phoenix Mutual Life Insurance Co.,* 300 N.C. 247, 262, 266 S.E.2d 610, 620 (1980). Of course, it is an accepted tenet of basic antitrust law that § 5 of the Federal Trade Commission Act sweeps within its prohibitory scope conduct also condemned by § 1 of the Sherman Act. *See, e.g., FTC v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *FTC v. Beech-Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922). We are offered, and can perceive, no reason to conclude that, given the opportunity, North Carolina's Supreme Court would construe its state's act any differently. Indeed, we held as much with regard to the South Carolina Unfair Trade Practices Act, § 39–5–20(a), Code of Laws of South Carolina 1976, in our decision in *Bostick, supra,* at 1220, an act whose legislative heritage and judicial interpretation closely parallel North Carolina's.

■ We thus hold that proof of conduct violative of the Sherman Act is proof sufficient to establish a violation of the North Carolina Unfair Trade Practices Act.[9] It remains for us to determine whether ITCO is entitled to a trial so that it might prove such a theory of liability does indeed apply to Michelin's actions.[10]

9. We thus necessarily reject Michelin's contention that the federal antitrust laws occupy the field and that North Carolina is therefore preempted from making conduct that offends § 1 of the Sherman Act violative of its own laws as well. "Nothing in the nearly century-old history of federal antitrust regulation is cited to us to suggest that Congress has manifested a clear intent to displace state regulation of unfair trade practices." *Bostick Oil Co. v. Michelin Tire Corp.,* 702 F.2d 1207, 1219 (4th Cir.1983), cert. denied, —— U.S. ——, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983).

Similarly lacking in merit is Michelin's suggestion that state regulation of unfair trade practices that touch upon interstate commerce is rendered unconstitutional by the negative implications that flow from the Commerce Clause. "Not every exercise of state power with some impact on interstate commerce is invalid." *Edgar v. MITE Corp.,* 457 U.S. 624, 640, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (1982). Absent some reason to believe that the North Carolina act is an attempt directly to regulate interstate commerce, and is not an act designed to address primarily local concerns

which happens to have an occasional incidental, but not excessive, effect upon interstate commerce, we perceive no cause for constitutional concern.

10. That is not to say, of course, that there are not other theories under which ITCO might prevail on its unfair trade practices claim. Indeed, the prohibitory scope of the North Carolina act, as we recently noted in *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.,* 705 F.2d 712, 715–16 (4th Cir.1983), is potentially quite broad. *See also* Note, *Consumer Protection and Unfair Competition in North Carolina— The 1969 Legislation,* 48 N.C.L.Rev. 896, 908–09 (1970).

"Unfairness" and "deceptiveness" are prohibited. "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers .... An act or practice is deceptive ... if it has the capacity or tendency to deceive." *Johnson v. Phoenix Mutual Life Insurance Co.,* 300 N.C. 247, 263–65, 266 S.E.2d 610, 621–22 (1980).

### B

In *Bostick, supra,* at 1215, we held squarely on facts indistinguishable from those alleged here that a factfinder could reach a determination that § 1 of the Sherman Act had been violated:

> It is ultimately, then, a factual issue for the jury to determine whether Bostick was terminated to placate rival dealers objecting to price-cutting, or instead for lack of service facilities as Michelin claims. . . . [A] finding of *per se* violation of § 1 would result from a factual determination that the termination was in furtherance of competitors' desires to eliminate a price-cutting rival.

That holding was a reiteration of our decision in *Rice* that the combination or conspiracy necessary to establish § 1 liability, *see, e.g., United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), might be founded upon proof that Michelin's decision to terminate a dealer was made in response to complaints by rival dealers over price competition generated by the terminated dealer. As we acknowledged in *Rice, supra,* at 16:

> [W]e think it is important to distinguish between a conspiracy among dealers and their supplying manufacturer for the purpose of retail price maintenance that would benefit the dealers and one involving the same parties but redounding primarily to the benefit of the manufacturer as a result of increased interbrand competition. A restraint imposed by the former conspiracy would be horizontal in nature and *per se* illegal, while the one

imposed by the latter would be vertical and analyzed under the rule of reason.

On the basis of that authority, we are led inexorably to the conclusion that there is an antitrust theory under which ITCO might proceed which, being cognizable under § 1 of the Sherman Act, perforce could ground Michelin's liability under the state unfair trade practices act. As our decisions in *Bostick* and *Rice* make abundantly clear, the success of that theory hinges upon proof satisfactory to convince the factfinder that Michelin's decision to terminate its relationship with ITCO was a step in furtherance of a conspiracy to lessen price competition at the dealer level. The evidence previously essayed in this opinion—the same evidence introduced in the aborted trial in *Bostick* and held, on appeal, to have raised a factual question for the jury—raises a genuine issue of fact to be resolved in a trial on the merits. Of course, what the resolution of that factual issue will ultimately be we do not know, and do not intimate. Here we have had occasion only to consider ITCO's case in its strongest posture. We have not dealt with the evidence to the contrary which Michelin may be expected to muster.

### C

There being manifest a genuine issue of fact material, indeed, crucial, to ITCO's state law claim, it follows that the district court incorrectly granted summary judgment for Michelin on that claim and that the judgment must be reversed.[11]

---

ITCO has pressed other theories—among them, harsh dealing contrary to good faith and unfair competition under the common law. Without in any way opining upon the merit *vel non* of ITCO's additional theories, we merely note that the presence of a single potentially meritorious theory of recovery is enough to compel a reversal of the judgment below and a remand for trial.

11. A comment on the choice of North Carolina law is in order. Michelin contends that the law of New York, and not the law of North Carolina, should apply to the conduct at issue here. Of chief import to Michelin's argument is a contractual choice of law provision in the Dealer Sales Agreement providing:

> The parties hereto intend this Agreement to be executed as a New York agreement and to be construed in accordance with the laws of the State of New York.

On the basis of that provision, Michelin maintains that the North Carolina Unfair Trade Practices Act has no application to this case.

Federal courts, when exercising their diversity or pendent jurisdiction over state law claims, must of course, apply the choice of law rules applicable in the forum state. *E.g., Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The district court in this action, then, would be bound to look to the choice of law rules applicable in North Carolina's state courts.

Michelin maintains, however, that a remand for trial on ITCO's price-fixing theory is impermissible. It is asserted that ITCO, having dismissed its Sherman Act claim with prejudice in order to obtain this appellate correction of the district court's erroneous decision on the state law claim, should now be barred under the doctrine of *res judicata* from advancing, under the guise of the North Carolina act, what in essence is the Sherman Act claim already dismissed voluntarily.

▆▆▆ We are of the opinion that an application of *res judicata* on the facts of this case would stretch the doctrine past its breaking point. The doctrine of *res judicata* serves laudable purposes. Representing society's interest in the finality of judgments, the doctrine also is a manifestation of society's interest that all related claims and alternative legal theories for recovery [12] are brought together in one lawsuit. Sufficient encouragement to litigants who might otherwise fail to proceed in such economical fashion is provided by the risk that claims and theories unraised in the first litigation may be lost forever. As perhaps the leading commentary on federal procedure summarizes:

> The doctrine of res judicata is not a technical rule, but a rule of fundamental repose for both society and litigants. Its salutary principle "is founded upon the generally recognized public policy that there must be some end to litigation and that when one appears in court to present his case, is fully heard, and the contested issue is decided against him, he may not later renew the litigation in another court." *The doctrine prevents an encore and "reflects the refusal of law to tolerate needless litigation."*

1B J. Moore & T. Currier, *Moore's Federal Practice* ¶ 0.405, at 628 (2d ed. 1982) (footnotes and citations omitted) (emphasis supplied).

With those words in mind, it is at least a little ironic that Michelin argues for an application of *res judicata* here, where ITCO's decision to dismiss its Sherman Act claim appears to have been in furtherance of the doctrine's purpose in curbing needless litigation. Had ITCO *not* dismissed its federal claim and *not* sought an appeal, but, instead, taken its Sherman Act claim to trial, the prospect of wastefully duplicitous litigation would have arisen. Suppose, for instance, that the factfinder at that hypothesized trial were to reject ITCO's allegation of a price-fixing conspiracy, a possibility we implicitly recognized in *Bostick*. Michelin, in that event, would be entitled to a judgment in its favor. ITCO, on an ensuing appeal, would be free to challenge the cor-

---

We are satisfied that North Carolina's courts would apply N.C.Gen.Stat. § 75–1.1 to the facts presented here without regard to the presence of the contractual choice of law provision. The nature of the liability allegedly to be imposed by the statute is *ex delicto,* not *ex contractu.* No issue of contractual construction, interpretation, or enforceability is raised by this case. The liability alleged is predicated, rather, upon actions separate and distinct from the Dealer Sales Agreement itself.

The contractual provision thus set aside, we are left with the recent decision of *Lloyd v. Carnation Co.,* 61 N.C.App. 381, 387, 301 S.E.2d 414, 418 (1983), wherein the North Carolina Court of Appeals indicated that the law of the state where the injuries are sustained should govern. In *Lloyd,* plaintiff's claim under § 75–1.1 was denied on choice of law grounds, the court holding that Virginia law should apply. The court cited for that proposition the case of *Shaw v. Lee,* 258 N.C. 609, 129 S.E.2d 288 (1963), wherein it was observed that "claimant's right to recover and the amount which may be recovered for personal injuries must be determined by the law of the state where the injuries were sustained; if no right of action exists there, the injured party has none which can be enforced elsewhere." *Id.* at 610, 129 S.E.2d at 289.

Manifestly, the injuries sustained by ITCO, a North Carolina corporation with its principal place of business in North Carolina, were sustained in the state of North Carolina. *Cf. Vishay Intertechnology, Inc. v. Delta International Corp.,* 696 F.2d 1062, 1065 (4th Cir.1982): "Since a course of action is considered to arise where damage occurs, ... [the plaintiff's] location in North Carolina establishes the first requirement (that "the cause of action arose in North Carolina")." North Carolina's law on unfair trade practices, accordingly, would apply.

**12.** Or, if attention is turned to the defendant in a lawsuit, counterclaims and defenses.

rectness of the summary judgment granted Michelin on the state law claim. It is entirely possible that, given such a procedural posture compelling us to consider the alternative theories of § 75–1.1 liability advanced by ITCO,[13] we might conclude that ITCO should have been permitted a trial on any one or more of those alternative theories. A reversal, a remand, and a second trial in its entirety would thus be required. Countless witnesses and documents would have to be marshalled and presented a second time. Valuable judicial, witness, juror, and attorney time would be needlessly consumed.[14]

Only an application of *res judicata* in a fashion which has lost sight of that doctrine's underlying principles and purposes could prevent ITCO from pursuing its price-fixing theory on remand as a legitimate theory of liability under § 75–1.1. And, as a consideration of the evidence will show, only a hard-hearted lack of appreciation for basic notions of justice and fair play could do so. The record leaves no room for doubt —ITCO, Michelin, and the district judge all proceeded upon the understanding that the price-fixing theory would be preserved in the event of a successful, for ITCO, disposition of this appeal.

Counsel for ITCO asked the trial court to specifically condition the dismissal on such an understanding:

> In asking for this dismissal we want to make especially sure that we point out to the Court that we are not asking for a dismissal that will in any way affect the Chapter 75 claim; again, while we would not be trying to seek liability under the

Section 4 of the Clayton Act and therefore Section 1 of the Sherman Act after this claim is dismissed, we would reserve again the right to prove a conspiracy that would in fact violate Section 1 which then could be used as a basis for liability under Chapter 75.

.    .    .    .    .

> ... [W]e ... move that it be dismissed with prejudice, again with, hopefully, carefully worded language that preserves to us the full orbit of Chapter 75 liability which would include proof of Section 1 conspiracy—

The district judge responded:

> Well, I stated before on that that I don't see that this dismissal at all has anything to do with the relevancy of any evidence that would have been available to you under your Section 1 claim as against a Chapter 75 claim .... I see nothing to prohibit your going ahead and proving that claim with whatever relevant evidence is available to you.

Furthermore, in response to a query for clarification from counsel for Michelin, the district judge explained:

> I understand the effect of the plaintiff's motion to dismiss ... with prejudice to mean that this plaintiff does not desire to litigate in this or any other court those two counts again; and that the judgment rendered on his motion allowing it will be with prejudice and be nonappealable. But *he is reserving his right to bring witnesses here who would have testified to facts which had they been within the context or the ambit of a Section 1 claim would also be relevant on the Chapter 75*

**13.** *See* n. 10, *supra.*

**14.** Counsel for ITCO put it this way in the district court:

> [W]e are in somewhat of an unusual situation because we do feel that the central claim on which we have been conducting our discovery and preparing our case for the last four years has now been put beyond us ....
>
> But, Your Honor, we now face again this practical problem of the possibility of a couple of trials or the impact of an adverse decision, either on directed verdict or from the jury in this case on the Section 1.

> With all of that being considered, I think that the best course for our client, perhaps the best course again for all of the parties and the Court, is to put all our eggs in one basket for purposes of this case and the only way I think we can do that now, mindful of the economies that we lawyers must work with on this side of the room, is to ask the Court to dismiss Counts 1 and 2 from this case so that we might finally have an appealable order from this Court, so that we might then proceed to, by hook or crook, get the Fourth Circuit to rule one way or the other on our claims.

*claim. And I have told him and you that in my opinion the fact that he takes a dismissal with prejudice on a cause of action does not preclude his use of evidence which would have been favorable to him in that cause of action had it gone to trial.*

(emphasis supplied). Michelin's counsel understood:

Put simply, not to litigate those facts applicable to the Sherman Act claims unless they would have been independently relevant to Chapter 75.

It comes as no surprise that Michelin has been unable to direct our attention to a single decision according *res judicata* effect to the dismissal of one alternative claim in a single lawsuit to another alternative claim *in the same suit.*[15] Such an application of *res judicata* would defeat the very purposes the doctrine is intended to serve.

## III

A remand, consequently, is mandated so that ITCO may pursue its state law claim in a trial on the merits. With respect to Michelin's appeal, we similarly must reverse the district court's order granting summary judgment for ITCO on Michelin's counterclaim and remand that claim for further proceedings.

"[W]hen the plaintiff ... wrongfully perverts or abuses the processes of the court to coerce something for which the process was not intended, the court is warranted in granting relief to the victim of such coercion ... by recognizing an action for the tort of abuse of process." *Austin v. Wilder,* 26 N.C.App. 229, 233, 215 S.E.2d 794, 797 (1975). As the North Carolina Supreme Court stated in *Estates v. Bank,* 171 N.C. 579, 582, 88 S.E. 783, 784 (1916):

It seems to us to be beyond question that one who wantonly, maliciously, without cause, commences a civil action, and puts upon record a complaint and a *lis pendens,* for the purpose of injuring and destroying the credit and business of another, whereby that other suffers damages, must be liable for the legal consequences.

■ Bearing firmly in mind that controverted issues of fact are specifically *not* to be resolved on summary judgment, *see Smith v. University of North Carolina,* 632 F.2d 316, 338 (4th Cir.1980), we perceive a genuine issue of fact material to Michelin's counterclaim. Michelin contends that "the real reason ITCO filed suit and obtained a TRO was to be able to run a 'clearance' sale on Michelin tires to solve ITCO's documented cash flow deficit, and avoid paying Michelin for the tires it had used for the

**15.** Michelin places great, but wholly unjustified, reliance upon *Nash County Board of Education v. Biltmore Co.,* 640 F.2d 484 (4th Cir. 1981). We held in *Nash* that a consent agreement reached in one lawsuit should be accorded *res judicata* treatment in a subsequent lawsuit alleging, for all intents and purposes, the same claim:

The only differences between this action and the earlier action were (1) that this suit was based on the federal antitrust act and the earlier suit has based its legal claim on the state antitrust act and (2) the plaintiff in this later suit sought only treble damages but no injunctive relief.... The two suits allege the same wrongful act, the same illegal price-fixing conspiracy, the same operative facts in support of such conspiracy. The state and federal statutes upon which the two actions are based are identical in language except in the requirement of the federal statute, but not of the state statute, of a showing of interstate commerce.

Id. at 486, 488.

The correctness of that holding may be accepted unequivocally. But unlike the case here, *Nash* involved *two lawsuits*—a first and a second suit—and this raised the very policy concerns which the doctrine of *res judicata* is geared to address. Duplicitous litigation was presented as an evil to be avoided by *application* of the doctrine in *Nash.* The same evil is to be avoided in this case by *refusing to apply* the doctrine.

Indeed, in setting forth the "essential elements of the doctrine," the *Nash* court listed as two of the requisites: "(1) a final judgment on the merits *in an earlier suit,* [and] (2) an identity of the cause of action in *both the earlier and the later suit.*" *Id.* at 484 (emphasis supplied).

Stating the formal requirements for applicability of the doctrine of *res judicata* in that way makes perfect sense, for it is only where more than one lawsuit is involved that society's interests in the finality of a judgment and the avoidance of duplicitous litigation are implicated.

'sale' in the process [*i.e.*, tires obtained from Michelin after the TRO was entered]." Convincing the factfinder that ITCO truly instigated suit and sought a TRO for the reason alleged may or may not be difficult for Michelin to accomplish; that is a matter upon which we express no opinion. It is sufficient to note that the evidence thus far adduced gives rise to an unresolved factual question concerning the motives and justifications underlying ITCO's decision to bring suit and, in particular, to seek the TRO which enabled it to continue to receive tires from Michelin—tires for which, for some time, ITCO had not paid Michelin. A fact to be assessed, in that regard, is ITCO's subsequent losing of interest in maintaining its relationship with Michelin under the TRO; as observed earlier, ITCO withdrew a motion for a preliminary injunction, thus allowing the TRO to expire by its own terms.

### IV

It is perhaps a subject of too frequent reminder that antitrust cases are oftentimes poorly suited to disposition by way of summary judgment. This being such a case, we reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

DONALD RUSSELL, Circuit Judge, dissenting:

I dissent. I shall attempt to state my reasons briefly. To do so, however, requires some summarization of the circumstances under which the issue in this appeal arose.

This is an action in which federal jurisdiction was predicated on a claim of federal antitrust violations under the Sherman Act, to which was appended pendent actions under the North Carolina Unfair Trade Practices Act. There had been considerable discovery and both parties had filed motions for summary judgment. The motion by the defendant Michelin for summary judgment against the actions under the State Unfair Trade Practices Act was granted and Michelin's motion for summary judgment on the Sherman Act counts was denied.

The plaintiff sought of the district court the certification for a preliminary appeal under § 1292(b), 28 U.S.C., of the grant of summary judgment in favor of Michelin on the State claims. This request was denied. The plaintiff then moved to dismiss its Sherman Act action without prejudice. The district court refused to grant dismissal without prejudice. In so ruling, the Court said:

"Well, I would not dismiss the case without prejudice. That would be simply to allow the 1292 motion in effect and give the plaintiff leave to amend.

"I think that having come this close to trial and having made all these preparations and the Court having invested all of this time and being at least as conversant with it now I think as I will ever be during the course of another trial preparation that it would not be appropriate to dismiss the case without prejudice and I will not do that.

"At the same time I will not ask you to move for dismissal, knowing that; in other words, you can withdraw your motion if you want to. I'm not going to hold that against you."

To that ruling, with its permission to the plaintiff to withdraw its motion for dismissal of its antitrust action if it chose, plaintiff's counsel responded:

"Well, your Honor, in that case we will withdraw my motion for dismissal without prejudice and move that it be dismissed with prejudice, again with, hopefully, carefully worded language that preserves to us the full orbit of Chapter 75 liability which would include proof of Section 1 conspiracy—"

At that point, the Court said:

"Well, I stated before on that that I don't see that this dismissal at all has anything to do with the relevancy of any evidence that would have been available to you under your Section 1 claim as against a Chapter 75 claim. I say, I'm not ruling on it now but I see nothing to prohibit

your going ahead and proving that claim with whatever relevant evidence is available to you.

"The fact that once you would have used the same evidence in support of a different type cause of action I don't think would be held against you." [1]

Thereafter a formal order of judgment dismissing with prejudice the plaintiff's federal antitrust claim was entered. A voluntary dismissal by the plaintiff of his federal action with prejudice made "at any stage of a judicial proceeding" constitutes a final judgment of his claim and, "unless the court has made some other provision is subject to the usual rules of res judicata . . . ." 9 Wright and Miller, *Federal Practice & Procedure*, § 2367, pp. 185–86 (1971). This is both the federal and the state rule. *Astron Industrial Associates, Inc. v. Chrysler Motors Corp.*, 405 F.2d 958, 960–61 (5th Cir.1968); *Barnes v. McGee*, 21 N.C.App. 287, 204 S.E.2d 203, 205 (1974). And this rule of *res judicata* applies whether it is raised in a subsequent action or is asserted on appeal in the same case. *Bostick Oil Co. v. Michelin Tire Corp.*, 702 F.2d 1207, 1218, n. 22 (4th Cir.1983), *cert. denied*, ——— U.S. ———, 104 S.Ct. 242, 78 L.Ed.2d 232 (1983). In that case, the Court said:

"Bostick advanced two other Unfair Trade Practices Act-based theories which are no longer tenable in this case. One was that Michelin fraudulently induced

Bostick to enter the National Accounts program, a claim identical to that dismissed with prejudice below by agreement of the parties. We think that Bostick is foreclosed from reopening its fraud claim under a different heading here on appeal."

Assuming, therefore that the plaintiff's federal antitrust case is barred on principles of *res judicata,* the real issue in this case is the effect of that bar upon the plaintiff's state action. In *Nash Cty. Bd. of Ed. v. Biltmore Co.*, 640 F.2d 484 (4th Cir.1981), *cert. denied,* 454 U.S. 878, 102 S.Ct. 359, 70 L.Ed.2d 188, we had occasion to examine the North Carolina Unfair Trade Practices statute in relation to the federal antitrust law. We found that basically there was identity in the two statutes. The precise question in *Nash* was whether a dismissal with prejudice of the state antitrust action barred on *res judicata* grounds a later federal antitrust action. We held that it did. This case presents the question whether the judgment in a federal antitrust suit bars on *res judicata* grounds the maintenance of a duplicate state antitrust action. I submit that, while this case presents the opposite situation to *Nash,* the legal principle applicable in both cases is the same. If, as we held in *Nash,* the judgment in the state antitrust action barred the later federal antitrust action, it is equally logical and compelling that a judgment in the federal antitrust claim bars the identical claim under

---

1. I do not read this language of plaintiff's counsel as supporting the conclusion that the plaintiff "dismissed its federal claim on the understanding that whatever antitrust arguments it might have made under the Sherman Act that also are cognizable under the North Carolina Act would remain available in the event of success on appeal and a subsequent trial after remand." What counsel actually said in submitting his motion, as shown in the above quote of his language, was that "hopefully" the order for judgment of dismissal with prejudice would include "language that preserves to us the full orbit of Chapter 75 liability which would include proof of Section 1 conspiracy . . . ." I have also quoted the Court's response to this request. In this response, the Court made it plain that, "I'm not ruling on" whether "this dismissal at all has anything to do with

the relevancy of any evidence that would have been available to you under your Section 1 claim as against a Chapter 75 claim." That language, it would seem, does not justify a finding that there was any "understanding" on the effect of the dismissal; there could have been no such understanding in view of the District Court's categorical statement that he was "not ruling on" that question. Moreover, when the Court entered its formal judgment, it did not include any "carefully crafted" language that set forth any such understanding or ruling that included "language that preserve[d] to [the plaintiff] the full orbit of Chapter 75 liability . . . ." Under those circumstances the order of judgment granting the motion by the plaintiff to dismiss the federal antitrust action with prejudice gave rise to *res judicata.*

the North Carolina law and I submit we should so hold.[2]

This ruling would not mean that, to the extent that the North Carolina law includes provisions additional to and different from those that duplicate the federal antitrust statute, plaintiff's right to recover under those additional and different provisions of the North Carolina statutes would not be barred, and I agree with the majority opinion that the summary judgment of the District Court dismissing such actions, if any exist, should be reversed; but it does mean that any *right* of action under that part of the North Carolina statute which is similar to the federal antitrust actions which were dismissed with prejudice would be barred.

Since my opinion on the rights of the parties and the proper disposition of the appeal in the particulars as outlined above, differs with the majority, I dissent.

---

**2.** For an excellent comment on *Nash, see* Note, *The Res Judicata Effect of Prior State Court Judgments in Sherman Act Suits: Exalting* *Substance Over Form,* 51 Fordham L.Rev. 1374 (1983).