UTICA MUTUAL INSURANCE
COMPANY, INC., et al.

v.

WAY OF THE CROSS CHURCH
OF CHRIST, INC.

No. Civ.A. WMN–00–3383.

United States District Court,
D. Maryland.

April 3, 2002.

Lon A. Berk, James P. Bobotek, Shaw Pittman LLP, McLean, VA, for Plaintiffs.

John H. Zink, III, Ortho M. Thompson, Venable Baetjer and Howard LLP, Towson, MD, for Defendant.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court are cross motions for summary judgment. Paper Nos. 23 (Defendant's) and 24 (Plaintiffs'). The motions are fully briefed. Upon a review of the motions and the applicable case law, the Court determines that no hearing is necessary and that Defendant's motion will be granted.

## I. FACTUAL BACKGROUND

This case involves claims brought by two insurance companies against one of their insureds for indemnity and contribution. The series of events that brought the dispute to this Court is somewhat convoluted. The most relevant aspects of this history are summarized below.[1]

On or about February 28, 1996, Defendant Way of the Cross Church of Christ, Inc. (WOTC), purchased property from Riverdale Baptist Church, Inc. (Riverdale). To finance the purchase, WOTC entered into a Deed of Trust and Security Agreement with Riggs National Bank of Wash-

ington, D.C. (Riggs). WOTC also entered into an agreement with Defendant Graphic Arts Mutual Insurance Company, a member of Defendant Utica National Insurance Group, to insure the property. (Hereinafter, these two Defendants are collectively referred to simply as "Utica."). Riggs was listed on a supplemental declaration of the insurance policy as the mortgagee for the property.

On August 30, 1996, a fire occurred that caused serious damage to a gymnasium located on the property. At the time of the fire, the gymnasium was being used by the Riverdale Baptist School (Riverdale School). Shortly after the fire, WOTC retained the services of an independent insurance adjuster, the Steven A. Rosen Company, to act as WOTC's agent in negotiating the fire loss claim. More than nine months after the fire, on June 5, 1997, Utica's adjuster sent a letter to WOTC's adjuster confirming a conversation in which WOTC's adjuster accepted $668,401.39 as the estimate for repairs to the gymnasium. Depo. of Scott Rose, Exh. 5. The letter also stated that "in the event any additional damage is found and can be traced back to the fire, this would be handled as a supplement." *Id.* Consistent with that acceptance, Utica's adjuster stated that he was requesting that Utica issue a check for $534,721.12, an amount equal to 80% of the estimate.

On June 11, 1997, WOTC entered into a one page contract with Bernard Brooks and Sons Construction, Inc., for the repair of the gymnasium. The contract provided that the work would be done for $668,000.00, and would be completed within 90 days of the issuance of the notice to proceed. It also provided for an initial deposit of 30% of the contract price, or $233,000.00. Utica notes that the con-

---

1. Because the Court has determined that Defendant is entitled to summary judgment, the facts below are presented in the light most favorable to Plaintiffs.

struction company is owned by Bernard Brooks, the brother of Alphonzo Brooks, WOTC's pastor.

On June 17, 1997, WOTC's adjuster received a check from Utica for $534,721.12. The check was made payable to WOTC and WOTC's adjuster. The check did not include Riggs, the property's mortgagee, as a payee, although there is no dispute that consistent with the terms of the insurance policy, it should have. Utica attributes the omission of Riggs as a payee to a computer error on its part.

Upon receipt of the check, WOTC deposited it into a "Building Fund" account at Nationsbank, N.A. Within days of receipt, WOTC made the following dispersals from this account: on June 18, 1997, a check for $46,976.00 to its adjuster to cover fees for adjusting the claim; on June 18, 1997 and June 20, 1997, checks for $56,976 and $30,983, respectively, made payable to WOPC's pastor Alphonzo Brooks; and on June 20, 1997, a check for $334,000 to Bernard Brook's construction company, ostensibly to begin repairs on the property. As Utica notes, this amount was well beyond the deposit required under the contract. Bernard Brooks deposited the $334,000 check in a new account at Nationsbank on the day that it was drawn. On that same day, however, Bernard issued four checks totaling $231,478.00, back to WOTC.[2]

Sometime in June of 1997, Riggs became aware that WOTC had hired the pastor's brother's construction company to repair the gymnasium. According to Riggs's Executive Vice President, Albert Serafino, this information "raised a red flag" at Riggs. Serafino Declaration at ¶ 7. On June 25, 1997, Riggs contacted Utica and complained that they were not included as a payee on the insurance proceeds check. Riggs also sent a letter to WOTC demanding that the insurance proceeds be remitted to Riggs immediately. In late June or early July, representatives from Riggs and WOTC met together to address Riggs's demand. WOTC represented that all but $100,000 of the proceeds already had been distributed. WOTC agreed, however, that it would deposit that $100,000 in WOTC's existing account at Riggs and it did so, shortly thereafter.[3]

After the fire but before the insurance proceeds were distributed, WOTC defaulted on an obligation to buy back from Riverdale a $3.9 million note that was part of the original purchase agreement for the property. On July 15, 1997 Riverdale sued WOTC in Prince George's County Circuit Court for repossession of the property. In the Complaint, Riverdale also brought a claim for unjust enrichment in which it asserted that it was entitled to all of the insurance proceeds received by WOTC from Utica.

Riverdale moved for partial summary judgement in the Prince George's County litigation and the motion was granted on May 1, 1998. In the order granting the motion, WOTC was ordered to immediately pay Riverdale all insurance proceeds received with regard to the gymnasium fire. WOTC filed an appeal from that order, but before the appeal was decided, the parties settled the matter and the appeal was dismissed. Pursuant to the settlement, WOTC paid $1,000,000 and reconveyed the property to Riverdale. In

2. The amount of repair actually accomplished by Bernard Brooks's construction company, while a subject of some dispute, was clearly minimal. The work appears to have been limited, for the most part, to some demolition work.

3. Walter Lancaster, WOTC's corporate designee, testified that $25,000 of that $100,000 eventually went to Riggs to "use for attorney's fees," and the other $75,000 went back to WOTC's general fund. Lancaster Depo. at 66.

exchange, Riverdale executed a release for the benefit of WOTC, releasing all liabilities, claims, or debts owed to Riverdale by WOTC.

In August of 1998, Riggs sold the Deed of Trust to Riverdale Church. With that purchase, Riverdale acquired Riggs' rights as mortgagee under the Utica policy. On September 3, 1998, Riverdale's attorney informed Utica of Riverdale's acquisition of Riggs's interests, and demanded that Utica "re-issue the check payable to [Riverdale] in order that it be able to repair the facility and thus restore the value of the collateral." Scott Rose Depo., Exh. 20. Riverdale's attorney also opined that the funds advanced to WOTC, even if in the hands of Riverdale, would be insufficient to complete the work required.

When Riverdale did not receive insurance proceeds from Utica, it filed suit in the Circuit Court for Prince George's County, alleging that Utica breached its duties under the insurance contract. Riverdale moved for summary judgment, seeking a judgment of $905,448.24, the amount it believed to be the current cost of repairing the fire damage. The motion was granted on February 4, 2000, and judgment was entered in favor of Riverdale for $905,448.24, although Utica has yet to actually pay the judgment, in whole or in part.[4] Instead, Utica filed the instant suit in November of 2000, seeking a judgment declaring that WOTC is liable for any amounts Utica might be obligated to pay Riverdale as a result of the Riverdale litigation.[5]

Both sides have now moved for summary judgment. Utica argues that it cannot be disputed that WOTC failed to either use the fire loss proceeds paid by Utica to timely and properly repair the gymnasium, or to turn the proceeds over to its mortgagee. Because the damages suffered by Riverdale were directly caused by these failures, and because Utica has been made to answer for those damages in the form of the judgment entered against it in the Riverdale–Utica litigation, Utica asserts that it is entitled to indemnification and/or contribution from WOTC for any amount it is forced to pay Riverdale. In its cross motion, WOTC argues that Utica's claims do not fit within the criteria established under Maryland law for either of those equitable doctrines to apply. WOTC characterized the instant suit simply as an attempt to circumvent the applicable statute of limitations that now precludes Utica from bringing whatever tort or contract actions it could have timely brought directly against WOTC.

## II. LEGAL STANDARD

A moving party is entitled to summary judgment only if it can show that there exists no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Blue Ridge Ins. Co. v. Puig, 64 F.Supp.2d 514 (D.Md.1999) (citing, inter alia, Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

When both parties file motions for summary judgment, the court applies the same

---

4. After the instant suit was filed in this Court, the judgment in the Riverdale–Utica litigation was vacated by the Maryland Court of Special Appeals, and remanded to the Circuit Court for further proceedings as to damages. Utica Mutual Ins. Co. v. Riverdale Baptist Church, No. 0542 (Sept. Term, 2000). Because the final determination of damages is still pending, Utica is now seeking a judgment as to liability only.

5. Utica has also sued Riverdale School, claiming that it was the school's negligence that caused the fire. Utica asserts the claim against Riverdale School as the subrogee of WOTC, based upon Utica's payment of insurance proceeds to WOTC.

standards of review. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment") (emphasis omitted), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." *Towne Mgmt. Corp. v. Hartford Acc. and Indem. Co.*, 627 F.Supp. 170, 172 (D.Md.1985) (quoting Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil* 2d § 2720 (2d ed.1993)).

### III. DISCUSSION

■ It is clear that the theory of indemnity it not applicable here. Under Maryland law, indemnity is a right which inures to a person who has discharged a duty which is owed by him but which, as between himself and another, should have been discharged by another. *Hartford Accident & Indemnity Co. v. Scarlett Harbor Assoc. Ltd. Partnership*, 109 Md.App. 217, 275, 674 A.2d 106 (1996). Indemnity involves "the shifting of the entire loss from the party who paid the judgment to the tortfeasor [or wrongdoer] who should in fairness bear it." *Id.*

■ The duty owed by Utica to Riggs, and then to Riverdale, that gave rise to the judgment was the duty to pay the loss on the fire claim. There is no reason to conclude that this duty was also dischargeable by WOTC. Furthermore, as the facts recited above reveal, it would be patently unfair to shift the entire burden of the judgment to WOTC. While Utica obscures the fact, it apparently never paid the en-

tire claim to WOTC. The initial estimate of the fire damage, agreed upon by Utica, was $668,401.39. That estimate also left open the possibility of supplemental claims if additional damage were discovered. Utica paid WOTC only $534,721.12, or 80% of $668,401.39. Utica provides no explanation as to why WOTC should now cover the entire claim.

Utica's specific theory of indemnity is also somewhat obscure. In the Complaint, Utica simply states that it is entitled to indemnity because WOTC failed to provide Riggs with the insurance proceeds, and failed to use the proceeds to repair the insured property. Complaint at ¶ 22. In its motion, it refers to an "implied indemnity theory," and cites *Hanscome v. Perry*, 75 Md.App. 605, 542 A.2d 421 (1988). Motion at 16. In its reply memorandum, Utica again cites *Hanscome* for the proposition that "a party may seek implied indemnification when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility ... *or when there is a generally recognized special relationship between the parties.*" Reply at 10 (quoting *Hanscome*, 75 Md. App. at 615–16, 542 A.2d 421, emphasis added by Utica). Utica then boldly opines that "it is well established that a special relationship exists between an insurer and its insured." Reply at 10.

The two cases cited by Utica for the "well established" recognition of this "special relationship" are *Vu v. Prudential Prop. and Cas. Ins. Co.*, 26 Cal.4th 1142, 113 Cal.Rptr.2d 70, 33 P.3d 487, 491–92 (2001) and *Todd v. Liberty Mutual Ins. Co.*, No. 3–00–CV–2405–BD, 2001 WL 1297193 at *2 (N.D.Tex. Oct. 9, 2001). While both decisions acknowledged a special relationship between the insurer and the insured, both spoke of that relationship only in terms of the duty running from the insurer to the insured. *See, Vu*, 26 Cal.4th

at 1150, 33 P.3d 487 ("Under this special relationship, an insurer's obligations are greater than those of a party to an ordinary commercial contract"); *Todd*, at *2 (insurer owes insured a duty of good faith and fair dealing arising from the special relationship of trust created by a contract of insurance). Of further note is the fact that, in neither of those cases did the court find that the "special relationship" was sufficient to support the theory of relief advanced by the plaintiff. While the insurance relationship is undeniably recognized as a special relationship, nothing in the nature of that relationship gives rise to a duty on the part of the insured to cover an insurance claim.

■ Utica's claim for contribution is slightly more plausible. Under Maryland law, a claim for contribution can be asserted between two parties where a common obligation or debt is owed to a third party. *Lerman v. Heemann*, 112 Md.App. 320, 325, 685 A.2d 782 (1996). Contribution arises "from the duty each wrongdoer owes to the injured party and not from any obligation among themselves." *Fischbach & Moore Intern. Corp. v. Crane Barge R 14*, 632 F.2d 1123 (4th Cir.1980). The common liability to the injured party can arise out of two separate contracts or instruments, as long as the liability is for the "same identical debt." *Craig v. Ankeney*, 4 Gill 225, 1846 WL 1844 (Md.1846). Here, Utica claims that both it and WOTC had a mutual obligation to ensure that Riggs received the fire loss proceeds. Utica's obligation arose out of the insurance contract. WOTC's obligation arose out of the Deed of Trust.

■ It is not clear that the scope of WOTC's obligation under the Deed of

Trust was identical to that of Utica's under the insurance contract. Regardless of whether it may have been at one point, it is clear that it is not now. When WOTC paid $1,000,000 to settle the Riverdale–WOTC litigation, it secured a release of its entire obligation to Riverdale, which included WOTC's obligations to Riggs (which Riggs had previously assigned to Riverdale).[6]

Contribution, like indemnity, is grounded in fairness. It "is an implied equity, resting upon the plainest principles of morals and natural justice." *Craig*, 1846 WL 1844 at *4. Balancing the equities in the instant action, the Court is not compelled to fashion a remedy for Utica. In its Complaint, Utica raises allegations that undoubtedly would have supported a claim against WOTC for breach of contract, and possibly even unjust enrichment, conversion, fraud, or misrepresentation. From the record before this Court, it appears that Utica was made aware of a potential serious problem as early as June 25, 1997, when Riggs called to complain that it was not included as a payee.

For whatever reason, Utica elected not to bring those claims against WOTC, and now they appear to be time barred. Utica also had the opportunity when it was sued by Riverdale to bring WOTC in as a third party defendant, but again elected not to do so.

In the meantime, WOTC was sued by Riverdale, suffered a judgment, and paid $1,000,000 in order to obtain a release of Riverdale's claims. While WOTC may have received $534,721.12 from Utica, it has paid out almost twice that amount to Riverdale. Thus, in no sense has WOTC been unjustly enriched.[7]

---

**6.** Utica raises a somewhat confusing, if not undecipherable, argument as to why Riverdale could not release WOTC from any liability pursuant to the Deed of Trust. *See* Utica Reply at 10. To the extent the Court is able

to understand the argument, it finds no merit in it.

**7.** It appears from the record before the Court that, if Riverdale is allowed to collect from

In *Hanscome,* the decision relied upon most heavily by Utica, the court was faced with a similar situation where a party whose claims became barred through her own inaction, later tried to turn to equity for relief. The Maryland Court of Special Appeals rebuffed that attempt, holding:

> it is important to keep in mind the underlying nature and purpose of an *implied* right of indemnification. Conceptually, implied indemnification finds its roots in the principles of equity. It is nothing short of simple fairness to recognize that a person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity. To prevent unjust enrichment, courts have assumed the duty of placing the obligation where in equity it belongs.
>
> ... This case, on its facts, is simply an attempted end run around the statute of limitations, which the law does not allow.

75 Md.App. at 620–21, 542 A.2d 421.

Likewise, this Court will not turn to equity to create a remedy for a party that slept on its remedies in law. Defendant's motion for summary judgment will be granted. A separate order will issue.

### *ORDER*

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this day of April, 2002, by the United States District Court for the District of Maryland, ORDERED:

1. That Plaintiffs' Motion for Summary Judgment, Paper No. 24, is DENIED;

2. That Defendant's Motion for Summary Judgment, Paper No. 23, is GRANTED;

3. That judgment is entered in favor of Defendant and against Plaintiffs;

4. That this action is hereby CLOSED;

5. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58; and

6. That the Clerk of the Court shall mail or transmit copies of the foregoing Memorandum and this Order to all counsel of record.

---

Utica for the entire amount of the fire damage, with no offset for the amount it has already obtained from WOTC for that same

damage, Riverdale would be unjustly enriched at Utica's expense. That, however, is not an issue before this Court.